**GEORGE WASHINGTON UNIVERSITY, Petitioner,**

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent.**

**No. 02–AA–172.**

District of Columbia Court of Appeals.

Argued June 19, 2003.

Decided Sept. 11, 2003.

Deborah B. Baum, with whom David J. Cynamon and Gerard M. Babendreier were on the brief, Washington, DC, for Petitioner.

Lutz Alexander Prager, with whom Arabella W. Teal, Interim Corporation Counsel, Charles L. Reischel,* Deputy Corporation Counsel at the time the brief was filed, and Donna M. Murasky, Senior Litigation Counsel, were on the brief, for Respondent.

Scott B. Schreiber, with whom Matthew D. Keiser and Emily M. Pasquinelli were on the brief, Washington, DC, for the George Washington University Student Association and the American Civil Liberties Union of the National Capital Area, amici curiae, in support of Petitioner.

Rebecca L. Taylor and Richard F. Johns submitted a brief for the Greater Washington Urban League, the District of Columbia Chamber of Commerce, and the Greater Washington Board of Trade, amici curiae, in support of Petitioner.

Martin Michaelson, Alexander E. Dreier, and Christopher T. Handman submitted a brief for the American Council on Education, the National Association of Independent Colleges and Universities, and the Consortium of Universities of the Washington Metropolitan Area, amici curiae, in support of Petitioner.

Vincent Mark J. Policy, Washington, DC, submitted a brief for the Apartment and Office Building Association of Metropolitan Washington, amicus curiae, in support of Petitioner.

Cornish F. Hitchcock, Washington, DC, submitted a brief for the Foggy Bottom Association, amicus curiae, in support of Respondent.

J. Michael Hannon and James F. Bromley, Washington DC, submitted a brief for Donald W. Kreuzer, D.M.D., amicus curiae, in support of Respondent.

Before SCHWELB and FARRELL, Associate Judges, and NEBEKER, Senior Judge.

SCHWELB, Associate Judge:

## TABLE OF CONTENTS

Page

---

* Mr. Reischel died less than one month after this case was argued.

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .926

I. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .928

II. THE STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .930

III. PHASE II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .932
 A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .932
 B. "Arbitrary and capricious" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .932
 (1) Substantial evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .932
 (2) Revised Conditions 9(b) and 9(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .933
 (3) Revised Condition 9(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .934
 (4) Revised Condition 9(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .936
 (5) Condition 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .937
 (6) Condition 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .938
 C. The Human Rights Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .938
 (1) Synopsis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .938
 (2) Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .939
 (3) Discrimination on account of student status . . . . . . . . . . . . . . . . . . . . . . . .941
 (4) The Comprehensive Plan and the Zoning Regulations . . . . . . . . . . . . . . . . . .942

IV. PHASE I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .944
 A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .944
 B. Revised Condition 9(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .945
 C. Condition 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .949

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .952

## INTRODUCTION

George Washington University (the University, GW, or GWU) has asked this court to review an order of the Board of Zoning Adjustment (BZA or Board), issued on January 23, 2002, imposing certain conditions on a campus plan for the development of the University for the period from 2001 to 2009. The conditions ordered by the Board were to be carried out in two phases. Those in the first (Phase I) were to be completed by August 2002; those in the second (Phase II) are to be completed by August 2006. The Board's conditions, as understood by the United States Court of Appeals in rejecting the University's constitutional challenge to them, were "aimed at limiting, and even rolling back, encroachment into [the Foggy Bottom and West End (FBWE) neighborhoods adjoin-

ing the campus] by the university—or, more precisely, its students." *George Washington Univ. v. District of Columbia, et al.*, 355 U.S.App. D.C. 12, 14, 318 F.3d 203, 205 (2003) (*GWU III*).

The University first challenged certain of the Board's conditions in the United States District Court, claiming that they were arbitrary and capricious and ran afoul of the Due Process Clause of the Fifth Amendment. The District Court sustained several of the University's constitutional contentions, *George Washington Univ. v. District of Columbia, et al.*, No. 01–0895–LFO (D.D.C. Apr.12, 2002) (Pet. App. C) (*GWU II*),[1] but in *GWU III* the United States Court of Appeals reversed those portions of the District Court's order. In its decision, the federal appellate

1. The District Court had previously issued a preliminary injunction against enforcement of certain provisions of an earlier version of the BZA's order. *George Washington Univ. v. Dis-* *trict of Columbia, et al.*, 148 F.Supp.2d 15 (D.D.C.2001) (*GWU I*). The case was ultimately remanded to the BZA, which issued the order presently before us.

court held that the Board's order was consistent with substantive due process, and that, at least from this constitutional perspective, the order was not arbitrary or capricious. The court recognized that the plan "draw[s] a distinction based on student status" that might or might not be in violation of substantive District of Columbia law, 355 U.S.App. D.C. at 18, 318 F.3d at 209, but did not decide the merits of any issues of local law raised by the University.

In this court, the University first challenges certain long-range conditions imposed by the BZA upon the campus plan (Phase II) on the grounds that they are arbitrary, capricious, and irrational. With the exception of one condition which, in our view, tends to chill the exercise by the University of its right to judicial review,[2] we reject the University's claim that these conditions are invalid under the applicable administrative law standards.[3] To that extent, we affirm most of Phase II of the Board's order.

■ The University also claims that the conditions imposed by the Board in both Phases of its order discriminate against students on account of matriculation, i.e., because they are students, in violation of the District's Human Rights Act (DCHRA), D.C.Code §§ 2–1401.01 et seq. (2001). We conclude, contrary to the District's position,[4] that the DCHRA applies

to the BZA's administration of the zoning laws. Nevertheless, we hold that when the DCHRA is read as a whole, and in conjunction with the District's Comprehensive Plan and its zoning regulations, the Act does not prohibit the BZA, in imposing conditions on the campus plan, from taking into consideration the "number of students" who would be housed in residential neighborhoods. We therefore conclude that Phase II, as ordered by the Board, does not violate the Human Rights Act.

Finally, the University contends that, even if the obligations imposed on the University's long term campus plan by the BZA in Phase II of the order are neither arbitrary and capricious nor contrary to the DCHRA, the Phase I conditions lack any rational basis and, in effect, require the University to perform the impossible and to undertake, at great expense, immediate measures that have no significant relationship to the BZA's goals in this case or to any legitimate zoning purpose. The University also claims that the conditions imposed by Phase I of the order have the practical effect of rezoning portions of the FBWE neighborhood, when the authority to rezone has been vested in the Zoning Commission, not in the BZA. We agree with some of these contentions. Accordingly, we vacate the Board's order in part and remand the case to the Board for further proceedings consistent with this opinion.

2. Revised Condition 9(f), discussed at pages 936–37, infra.

3. "[S]tate court scope of review of a decision of a state administrative agency is far broader than federal scope of review under substantive due process." Pearson v. City of Grand Blanc, 961 F.2d 1211, 1221 (6th Cir.1992). It is the state court standard that we, as a District of Columbia court, must apply when we are addressing administrative law claims rather than constitutional contentions. We

conclude, however, that most of Phase II satisfies the more searching administrative law standard.

4. Although the respondent in this case is the BZA, which is represented by the Office of Corporation Counsel, we refer to its legal contentions in this court as having been made by "the District." This avoids confusion between the Board's arguments in this court on the one hand and statements in its decision on the other.

## I.

### FACTUAL BACKGROUND

In realization of a vision of our nation's first President, after whom the University was named, GWU was established by federal charter in 1821. *GWU I*, 148 F.Supp.2d at 16. The University has thus been a part of the life of northwest Washington, D.C. for almost two centuries. The University's campus is bounded on the west and the north by the Foggy Bottom and West End sections of the city. The University and its neighbors have coexisted over the years and have enjoyed (or endured) varying levels of harmony or lack thereof.

During the past several decades, the University has expanded, and the number of GWU students and facilities in FBWE has significantly grown, all to the oft-expressed consternation of some neighborhood residents and organizations. District of Columbia officials, including the District's Office of Planning (OP) and, subsequently, the BZA, have discerned merit in some of the neighbors' concerns. In a report dated April 21, 2000, OP concluded that

> if the University continues to purchase land outside the campus plan boundaries and the number of students living in the small, constrained Foggy Bottom community continues to increase, the residential community will reach a "tipping point" where the Foggy Bottom community simply transforms into a "University area."

(Quoted in *GWU II*, Pet.App. C at 20.) In the final order presently under review, the BZA stated that "the University's aggressive expansion into Foggy Bottom and the West End area has brought those neighborhoods to the 'tipping point,' if not beyond." In addition, there was evidence before the Board, albeit somewhat episod-

ic, to the effect that some students living off-campus were noisy and comported themselves in a boisterous and disorderly manner. The issue before us concerns the legality of the measures ordered by the BZA to stem the growth of the University's presence in FBWE and to ward off or counteract the apprehended "tipping point."

The regulatory context in which the University and its adversaries have locked horns was described by Judge Stephen Williams, writing for the United States Court of Appeals in *GWU III*, as follows:

> The District's zoning scheme for universities, promulgated by the Zoning Commission pursuant to the authority granted by D.C.Code § 6–641 and codified at 11 District of Columbia Municipal Regulations ("DCMR") §§ 210, 302.2 & 507, permits university use as a matter of right in areas zoned for high-density commercial use. For land zoned residential or "special purpose," it permits university use as a special exception. GW's land evidently includes high-density commercial, special purpose, and residential portions. In the areas where university use is by special exception, the owner must secure permission for specific university projects in a two-stage application process. In the first stage, the university submits a "campus plan" that describes its general intentions for new land use over a substantial period (GW's preceding plan was for 15 years). On approval by the Board—an approval that can be subject to a set of conditions designed to minimize the impact of the proposed development—the campus plan "establish[es] distinct limitations within which all future construction must occur." *Levy v. D.C. Bd. of Zoning Adjustment*, 570 A.2d 739, 748 (D.C.1990). In the second stage, the BZA reviews individual projects that the

university proposes to undertake, evaluating them both for consistency with the campus plan and the zoning regulations. *See Draude v. D.C. Bd. of Zoning Adjustment*, 527 A.2d 1242, 1247–48 (D.C. 1987).

355 U.S.App. D.C. at 14, 318 F.3d at 205.

In the present case, the BZA held five hearings which are memorialized in a 4377–page record. The Board ultimately approved a campus plan for the University for 2001–2010 which permitted significant construction of non-residential facilities, but "only if the University promptly takes decisive action to provide housing for the bulk of its undergraduate students on campus."

At the time the Board issued its final order, there were 8044 undergraduates attending the University, but only 4108 on-campus beds available to house them. 1380 undergraduates were living in dormitories near the campus in the FBWE neighborhood. The University's use of these dormitories was "by right" and consistent with the zoning of the area. *See Watergate West, Inc. v. District of Columbia Bd. of Zoning Adjustment*, 815 A.2d 762, 765–67 (D.C.2003). One of the dormitories—the Hall on Virginia Avenue (HOVA), which was the subject of the *Watergate West* litigation—has been renovated at a substantial cost and specially designed to house freshmen. In order to induce the University to provide more housing for undergraduates on campus, the BZA imposed a number of conditions on its approval of the campus plan. For purposes of this litigation, the most important of these conditions is Revised Condition 9.

With respect to Phase I of the Board's order, Revised Condition 9(a) requires the University to provide at least 5600 beds for full-time undergraduates, either on campus or outside FBWE, no later than August 31, 2002.[5] In Phase II, Revised Condition 9(c) requires that after August 2006, the 5600 beds must all be provided on the GWU campus. Revised Condition 9(e) states that if the University is not in compliance with the requirements pertaining to student housing, then "[n]o special exception shall be granted and no permit to construct or occupy buildings for non-residential use on campus may be issued . . . ." This provision thus imposes a moratorium on any new nonresidential construction if the University has not complied with the residential requirements of the order, and it ordains the suspension or revocation, in that eventuality, of any prior approval of nonresidential on-campus construction or occupancy that may previously have been granted. Revised Condition 9(f) provides that if any portion of the BZA's order "is declared void for any reason by any court in any proceeding," then no application for a special exception or permit to occupy or construct a building or buildings on campus will be processed or issued unless expressly ordered by the Board. Finally, Condition 10 requires the University to house all freshmen and sophomores in University housing on the campus, and thus proscribes the use of HOVA for the purpose for which it was designed.[6]

---

**5.** As Judge Oberdorfer explained in *GWU II*, Pet.App. C at 4 n.3,

> [t]he 5600 figure represents a "soft cap"— the number is 70% of a base enrollment of 8000, and GW must provide an additional bed for every full-time undergraduate enrolled in excess of the base number. For example, if GW were to enroll 8100 full-

time undergraduates for the 2002–2003 academic year, the University would be required to supply 5700 beds.

*See* Revised Condition 9(b).

**6.** Married students, students who have children, students with religious beliefs inconsistent with dormitory life, and commuting students are exempt from this requirement.

The record provides us with ample reason to believe that the University will be able to comply with Phase II without undue difficulty. More than a year ago, in *GWU II*, Pet.App. C at 5, Judge Oberdorfer wrote as follows:

> Meanwhile, the University has plans, acknowledged by the Board with approval or reflected in the overall campus plan at issue here, to build on-campus residential housing over the course of the ten-year campus plan well in excess of the Board's 5600+ bed requirement. In August 2001, the University applied for special exceptions to build a 200–bed dormitory and a 700–bed dormitory on-campus, on Squares 57 and 43, both of which are expected to be complete by August 2004. *See* January 23, 2002 Order at 3. The University is also attempting to obtain approval to add an additional 200 beds as part of a previously approved planned unit development on Square 122, which the Board would permit to be counted towards the 5600+ bed requirement. *See id.* at 3, 20. If approved, this would give GW 5200 on-campus beds by the 2004–2005 academic year. In its Final Order, the Board "reasonably concluded" on the basis of the University's testimony and record evidence that GW has the ability to construct sufficient new on-campus housing to provide a total of 6189 beds by 2006, barring unusual delays, "more than enough to satisfy Condition 9."

Moreover, in an affidavit dated May 16, 2003, and filed in support of GWU's application for a stay of the BZA's order, the University's general counsel averred that he expects 5607 beds to be ready for occupancy on the campus by the fall of 2004.[7] The general counsel also described certain

significant nonresidential projects that were being held up pursuant to the terms of Revised Condition 9(e), including, *inter alia*, work on a Health and Wellness Center and on new Business School facilities. He pointed out that the United States District Court had invalidated Revised Conditions 9 and 10 in *GWU II*, and that it was not until May 5, 2003, that the United States Court of Appeals issued its mandate in *GWU III* affirming the BZA's order.

## II.

### THE STANDARD OF REVIEW

▰▰▰ The responsibility of the BZA, in reviewing a university's campus plan, was aptly summarized by the United States Court of Appeals as follows:

> [T]he BZA has substantial, but not unbounded, discretion to reject or approve the university's application. It is instructed to make sure that any university use is located so that it is "not likely to become objectionable to neighboring property because of noise, traffic, number of students or other objectionable conditions." 11 DCMR § 210.2. When reviewing a special exception application for a university, the BZA is also to consider the policies of the so-called "District Elements of the [Comprehensive] Plan," *id.* § 210.7, a planning document setting out development policies for the District, 10 DCMR § 112.6(b). If the application meets these criteria— that is to say, the proposed use is consistent with the Comprehensive Plan and is not likely to become objectionable to users of neighboring property—the Board "ordinarily must grant [the] application." *Stewart v. D.C. Bd. of Zon-*

---

7. Obviously, this affidavit was filed well after the Board's final order and the information therein was not and could not be considered

by the Board when it issued that order. See note 21, *infra*.

*ing Adjustment,* 305 A.2d 516, 518 (D.C. 1973).

*GWU III,* 355 U.S.App. D.C. at 14–15, 318 F.3d at 205–06.

 Our review of the Board's factual determinations is deferential. We must affirm its factual findings if they are based on substantial evidence in the record as a whole. *See* D.C.Code § 2–510(a) (2001); *Georgetown Residents Alliance v. District of Columbia Bd. of Zoning Adjustment,* 816 A.2d 41, 45 (D.C.2003); *Watergate West,* 815 A.2d at 765. Substantial evidence is relevant evidence which a reasonable trier of fact would find adequate to support a conclusion. *Giles v. District of Columbia Dep't of Employment Servs.,* 758 A.2d 522, 524 (D.C.2000). We must determine (1) whether the agency made a finding of fact on each material contested issue of fact; (2) whether substantial evidence in the record supports each finding; and (3) whether the conclusions of law follow rationally from the findings. *Foggy Bottom Ass'n v. District of Columbia Zoning Comm'n,* 639 A.2d 578, 584–85 (D.C. 1994); *George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment,* 429 A.2d 1342, 1345 (D.C.1981).

 The Board's conclusions must be sustained unless they are "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." D.C.Code § 2–510(a)(3)(A) (2001). "It is[, however,] emphatically the province and duty of the judicial department to declare what the law is," *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803),

and although we accord weight to the agency's construction of the statutes which it administers, the ultimate responsibility for deciding questions of law is assigned to this court. *Harris v. District of Columbia Office of Worker's Comp.,* 660 A.2d 404, 407 (D.C.1995).

Because many of the issues now before us were initially presented to the federal courts, and because the United States Court of Appeals sustained the District's position in *GWU III* on all of the issues before that court, a brief comparison is appropriate between the legal standard that governed the federal litigation and the standard that we must apply here. To summarize, the United States Court of Appeals was required to determine whether the BZA's order ran afoul of the Fifth Amendment's Due Process Clause. This Clause "imposes only very slight burdens on the government to justify its actions ...." *GWU III,* 355 U.S.App.D.C. at 15, 318 F.3d at 206. Indeed, "the doctrine of substantive due process constrains only egregious government misconduct." 355 U.S.App.D.C. at 18, 318 F.3d at 209. It is designed to prevent only "grave unfairness." *Id.* (citation omitted). The court further emphasized the obligation of the courts to limit the role of substantive due process review of administrative action "to extreme cases." *Id.* (citation omitted).

 By contrast, our own scope of review of the BZA's decision, while deferential, is substantially broader. *Pearson, supra* note 3, 961 F.2d at 1221.[8] It is true

8. In *Pearson,* the court stated:
 The use of the term "arbitrary and capricious" in [the due process] context causes considerable confusion, because these same terms are also used to describe the scope of review by state courts of state administrative action. Therefore, it must be emphasized that the state court scope of review of a decision of a state administrative agency

is far broader than the federal scope of review under substantive due process.
 In some states, a state court may set aside state administrative action as being "arbitrary and capricious" on the ground, among others, that it is not supported by substantial evidence. No such ground may be used by the federal court in reviewing state administrative action in connection

that some passages in *GWU III* are so phrased as to make it appear that they might be dispositive of issues before this court. *See, e.g.,* 355 U.S.App. D.C. at 19, 318 F.3d at 210 ("[n]or is there any irrationality in the District's policy"). But it is important to recognize, in reading language of this kind in the federal appellate court's opinion, that we are obliged to look at the same facts that were before that court through a significantly different legal "prism." *Cf. In re Baby Boy C.,* 581 A.2d 1141, 1182 (D.C.1990) (per curiam) (Ferren, J., concurring).

## III.

## PHASE II

### A. *Introduction.*

We turn now to the University's various objections to the Board's decision. In our analysis, we first address the long-range campus plan and consider the University's contentions with respect to the conditions imposed by the Board on Phase II. The University claims that the BZA's decision is arbitrary and capricious under applicable administrative law standards, and also that the conditions imposed by the Board contravene the Human Rights Act. We address each contention in turn.

### B. *"Arbitrary and capricious."*

#### (1) *Substantial evidence.*

 Evidence was presented to the BZA that the University's activities in FBWE had increased substantially in recent years. Some of these activities are summarized in the District's brief as follows:

> In 1999, GW leveled 33 townhouses, eliminating well over two-thirds of the housing on square 43, the block that the 1985 Board had retained for general residential use. It bought off-campus apartment houses (the Dakota and the Aston) which it converted to dormitories available only to students. It had bought and converted the former Howard Johnson's hotel on Virginia Avenue. The university had also acquired a 28% limited partnership interest in Columbia Plaza, an 800–unit apartment complex across a southwestern corner of the campus, with a right of first refusal if the partnership decided to sell. The university had no immediate plans for the complex but was ready to acquire it if the opportunity presented itself.[9]
>
> The university's 1999 proposal did not contemplate additional on-campus housing. It did, however, propose to build another 753,000 square feet of gross floor area for *non* residential uses on the residentially-zoned portion of the campus.

(Citations omitted.) As previously noted, the Office of Planning was of the opinion that the "tipping point" had almost been reached in FBWE and that decisive action was required to reverse the trend.

Nevertheless, according to the University, the record does not contain substantial evidence to support the Board's finding that the FBWE neighborhood has been

with a federal substantive due process attack, however. In the federal court the standard is a much narrower one. The administrative action will withstand substantive due process attack unless it is not supportable on any rational basis or is willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case.

961 F.2d at 1221 (footnotes and internal quotation marks omitted).

9. These acquisitions obviously created an "incremental" student presence in FBWE. *See Spring Valley Wesley Heights Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 644 A.2d 434, 436 (D.C.1994).

subjected to the population pressure, student malfeasance, or resident displacement which, in the Board's view, justified the conditions that the Board imposed. The University points to what it describes as a paucity of "hard data" in the Board's order, and argues that there is no evidence that the University or its students had a negative impact on that neighborhood. We conclude, to the contrary, that the Board properly relied on the acquisitions described above and on three key sources of substantial evidence demonstrating the effect of the University's activities on FBWE: the District's Comprehensive Plan, the opinions of the Office of Planning and the local Advisory Neighborhood Council (ANC) No. 2A, and the testimony of Foggy Bottom residents.

The Comprehensive Plan, a detailed planning document proposed by the Mayor and enacted by the Council of the District of Columbia, identified FBWE as an area suffering from diminishing housing stock. According to the authors of the Comprehensive Plan, this diminution was the result of the expanded presence of the University and its students in FBWE. *See* 10 DCMR § 1327.1(b). The Plan also cited the "negative effect" of student pressure on the neighborhood. *See* 10 DCMR § 1358.1. The Comprehensive Plan associated the perceived deterioration of FBWE with the acceleration of the University's activities in the area and with the influx, in recent years, of students residing in housing acquired by the University. See also discussion at pages 33–34.

In addition, the Office of Planning and the ANC submitted reports that detailed the negative impact of what they believed to be excessive University expansion. Both organizations argued that if the University failed to provide more on-campus housing for its undergraduates, the FBWE neighborhood would irreparably suffer.

Finally, the Board heard anecdotal evidence from citizens who testified regarding their own personal travails allegedly caused by the University's expansion.

 We believe that the Board was entitled to rely on the foregoing sources as substantial evidence supporting its findings. The Comprehensive Plan contains legislative findings, and the Board may look to it "for general policy guidance." *Nat'l Cathedral Neighborhood Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 753 A.2d 984, 987 (D.C.2000) (per curiam) (citing 10 DCMR § 112). Further, the Board is required by statute to give "great weight" to the concerns of the ANC and of the OP. *See* D.C.Code §§ 1–309.10(d)(3)(A); 6–623.04 (2001). Finally, the Board was free to accord appropriate consideration to the testimony of witnesses at its own hearings, and to credit the complaints of residents regarding University expansion and the problems that this expansion is said to have caused. We entertain no doubt that the evidence in the record permits a reasonable trier of fact to conclude that the expanded presence of the University was "likely to become objectionable to neighboring property" by reason of, *inter alia,* the "number of students" residing in University-owned housing in FBWE, *see* 11 DCMR § 210.2, and that reasonable measures are required to stem the tide. The University's challenge to the Board's findings for lack of substantial evidence therefore fails.

(2) *Revised Conditions 9(b) and 9(c).*

 The University claims that it was arbitrary and capricious for the Board to require in Revised Condition 9(c) that 5600 beds (with one additional bed for each additional student above 8000) must be available on campus by 2006. The required minimum of 5600, according to the University, has no evidentiary basis, and it

is said to have been selected in an impermissibly arbitrary fashion.

We disagree. The record reveals that this number was not conceived or created out of whole cloth. Rather, it was derived by calculating 70% of the number of students that was generally considered to be the University's base undergraduate population at the time of the Board's hearings, namely, 8000. The percentage of students who were to reside on campus—70%—was based on recommendations by the OP and, for that matter, of the University itself. Indeed, the University projected its long term goal to be the housing of 80% of the undergraduate population on campus. Moreover, given the University's plan to exceed the target of 5600 undergraduate beds on campus, and its ability, according to its general counsel, page 10, *supra*, to accomplish this by the fall of 2004, that number is not unreasonable.

The University also challenges Revised Condition 9(b), which requires GWU to provide one additional on-campus bed for every undergraduate over the base population of 8000. While marginally exceeding the University's short term goal of providing beds for 70% of its students, but gradually approaching its long term plan to provide beds for 80%, Revised Condition 9(b) reasonably accommodates the reality that FBWE is a finite neighborhood, and that an across-the-board 70% requirement would be ineffective if undergraduate enrollment were to increase dramatically. The justification for Revised Condition 9(b) may be illustrated by hypothesizing the admission of 15,000 undergraduates.

Under a strict 70% requirement, 4500 undergraduates would have to find housing off campus even if the University provided 10,500 (70% of 15,000) on-campus beds. Under the 70% plus one-for-one requirement, on the other hand, the number of undergraduates requiring housing off-campus would never rise above 2400, *i.e.,* 30% of the 8000 base, regardless of the total enrollment. The one-for-one provision is therefore an important element of the overall plan, for it protects the finite housing stock in FBWE from additional pressure from "student only" housing. We conclude that neither Revised Condition 9(b) nor Revised Condition 9(c) is arbitrary or capricious, and that both provisions must be sustained.

### (3) *Revised Condition 9(e).*

■ ■ The University also takes issue with the Board's enforcement mechanism in Revised Condition 9(e)—a moratorium on non-residential development on the campus if the University fails to provide additional on-campus beds as required. This moratorium is impermissible, according to the University, because there is said to be no rational connection between the nonresidential facilities that the University is seeking to build and the residential construction that it is accused of seeking to delay. Judge Oberdorfer addressed this issue thoughtfully and in considerable detail, and he twice found merit in the contention that Revised Condition 9(e) violates the Fifth Amendment's Due Process Clause. *GWU I,* 148 F.Supp.2d at 18; *GWU II,* Pet.App. C at 23–29.[10] In *GWU*

---

10. In *GWU II,* Judge Oberdorfer wrote, *inter alia,* Pet.App. C at 27–29:

A blanket refusal by the Board, or other relevant decision makers, to "pre-freeze" approval of any special exceptions or permits sought by the University for non-residential projects, would be, in the circumstances presented here, unconstitutionally

arbitrary and capricious and in contravention of existing zoning laws and regulations. District zoning authorities are required by law to consider a university's applications for a special exception. Zoning regulations require that the Board's successor, the Zoning Commission, *"shall hear and decide* all applications filed"* by a university for,

*III*, however, the United States Court of Appeals found no constitutional infirmity in Revised Condition 9(e):

> Condition 9(e) prohibits the issuance of any new "permit to construct or occupy buildings for nonresidential use on campus" whenever "a semiannual report reveals that [GW] is not in compliance" with the conditions of the Order. The university claims that this condition is purely punitive, as it lacks any relationship to the District's goal of protecting the neighborhood. After all, it says, prohibiting the construction of non-residential buildings will not cause the new dormitories currently under construction to be completed more rapidly. But Condition 9(e) clearly serves two functions that advance the District's goals. First, it strengthens the university's incentive to comply with the housing provisions. Second, even though the new non-housing construction that Condition 9(e) holds hostage may not relate directly to new housing demands (e.g., new labs replacing old ones do not necessarily meet needs generated by *increased* students), the condition as a general matter keeps housing and non-housing growth proceeding in parallel.

355 U.S.App. D.C. at 20, 318 F.3d at 211 (emphasis in original).

Even considering our less deferential standard of review, we agree with the United States Court of Appeals. If the kinds of sanctions for noncompliance with the BZA's orders specified in Revised Condition 9(e) were not available, the other provisions of Revised Condition 9 would, as a practical matter, be unenforceable and largely hortatory. Moreover, before the BZA, the University effectively conceded the Board's authority to impose conditions of this kind. GWU's general counsel, speaking on behalf of the University, suggested that the Board should deny special exceptions for new buildings if the University was out of compliance with its housing obligations: "That's the stick that's hanging over one's head and it's driving our commitment." The University's witness also asked rhetorically: "Can this Board reject a project because the University is not otherwise in compliance with the [campus] plan? ... That's perfectly legitimate. The Board has that authority." Although the foregoing comments may not have constituted a blanket consent to all of the conditions ultimately imposed by the Board, they reinforce our view that Revised Condition 9(e) should be upheld.[11]

In sum, Phase II, as approved by the Board, gives the University until August 2006 to accomplish measures which it proposes to take in any event. Revised Condition 9(e) tells the University that, after that date, the University may not make campus allocation decisions which place nonresidential uses over residential ones.

---

among other things, "the further processing of an approved campus development plan to permit the construction and use of a specific building or structure within a campus." 11 DCMR [§ ] 3035.1 (emphasis added).

. . . .

Condition 9(e) aims to sanction GW if it falls short of the Board's 5600+ residential housing requirement, by placing a blanket prohibition on ongoing or future non-residential development, and penalizes the University even further by holding open the threat that any exceptions or permits previously issued under the campus plan may be revoked. This enforcement provision not only exceeds the Board's authority; it also cannot be reconciled with the District's regulations governing the issuance of special exceptions and the issuance and revocation of building permits and certificates of occupancy.

11. A witness for the University also testified: "We have a mature, older campus, and it's getting to be a zero sum that, if you do academic, you can't do housing."

We conclude that this condition is reasonable and neither arbitrary nor capricious.[12]

### (4) Revised Condition 9(f).

■■■ Revised Condition 9(f) states that if any provision in Revised Condition 9 is declared invalid by any court in any proceeding, then no application for a special exception, or for a permit to occupy or construct any on-campus building for nonresidential use, shall be processed or issued without the Board's express authorization. The obvious vice of this extraordinary provision is that, on its face, it chills the exercise by the University of its fundamental right to seek judicial redress against allegedly arbitrary agency action. As Judge Oberdorfer wrote in *GWU II*,

> [i]t is a core function of Article III courts to resolve any case or controversy about the constitutionality of government action, state or federal, and if necessary, fashion a remedy for government action detrimental to the Constitution. It is well-established that even Congress itself "clearly cannot define a constitutional right out of existence by preventing courts from crafting an effective remedy." *Gilmore v. California*, 220 F.3d 987, 1006 (9th Cir.2000).

Pet.App. C at 30.[13] Revised Condition 9(f) effectively states that if a court provides the University with a remedy for agency action that violates the University's rights, then it shall be *the University* that must, at least temporarily, suffer unfavorable consequences.

In *GWU III*, the United States Court of Appeals found it unnecessary to decide whether Revised Condition 9(f) was a lawful and valid exercise of the Board's authority:

> The university characterizes this provision as an unconstitutional incursion into the province of the judiciary, because it punishes the university for exercising its legal right to challenge invalid provisions. Under our conclusion here that no other provisions of the Order are void, however, we see no need to address a condition that would take effect only on the opposite contingency.

355 U.S.App.D.C. at 20, 318 F.3d at 211. Because our federal appellate colleagues apparently failed to consider the evident chilling effect of this provision—if the University successfully challenges an action by the Board, it forfeits, at least temporarily, any nonresidential projects on campus—we cannot agree that the judicial hand should be stayed. Moreover, the premise for the federal court's conclusion that it need not decide the issue does not apply here, for we conclude in this opinion that certain conditions placed on Phase I of the Board's order, as well as Revised Condition 9(f) itself, should be struck down.

The District defends Revised Condition 9(f) as no more than a provision declaring that the BZA's order is non-severable. We do not doubt that the BZA may properly view the various parts of its order as mutually complementary, and may think it appropriate to reconsider the order as a whole if it is invalidated in part. If that was the aim of Revised Condition 9(f),

---

12. As the Board noted in its order denying the University's application for a stay, if the conditions "are not capable of being complied with," the University may make a request to the Zoning Commission "to amend the campus plan due to unforeseen hardship preventing compliance with the conditions."

13. Although the University has not raised the issue, and we do not decide it, Revised Condition 9(f) also arguably contravenes Section 261 of the DCHRA, D.C.Code § 2–1402.61 (2001), which prohibits retaliation against any person for exercising any right protected by the Act.

however, the BZA could have framed that condition in those terms. Instead, the Board decreed that a successful effort by the University to obtain judicial redress would generate an immediate, automatic, and (on its face) punitive ban on otherwise lawful projects. As written, Revised Condition 9(f) intrudes upon the separation of powers in an arbitrary and unreasonable way, and it arguably violates the Human Rights Act as well. See footnote 13, *supra.*

### (5) *Condition 8.*

██ Judge Oberdorfer summarized Condition 8 as follows:

As a condition to approval of the campus plan, Condition 8 imposes limitations on student enrollment and the employment of faculty and staff. During the ten-year life of the plan, total student enrollment, including undergraduates and graduate students, both full-and part-time, may not exceed 20,000 at any one time. The number of full-time undergraduates and graduate students enrolled at any one time is not to exceed 16,553. At the same time, the Condition bars GW from employing more than 1,550 full-time faculty, or 2,236 full-and part-time faculty, at any one time, and limits it to no more than 9,000 full-time staff employees, or 10,293 full-time and part-time staff.

*GWU II*, Pet.App. C at 30–31 (citations omitted).

In its brief in this court, the University asserts that "[t]he BZA's decision to cap the overall student enrollment and the number of full-time equivalent students, as well as the maximum levels of faculty and staff, does not flow rationally from its findings of fact." The District responds that the University proposed Condition 8, that this condition was never challenged before the Board, that the proposed orders submitted by the University to the Board included head count caps, and that the equivalency cap, in particular, was a University proposal: "[F]or the first time, we're introducing an FTE cap." In its reply brief, the University does not deny that it failed to challenge Condition 8 before the Board, but argues, quoting *GWU III*, 355 U.S.App. D.C. at 20, 318 F.3d at 211, that while "[n]ormally, a party cannot attack its own proposed agency action, . . . presumably that concept would not apply where the proposal was closely tied to some other proposed action that the agency rejected." According to the University, its proposed orders before the BZA "were always put forth for negotiation purposes as a package[ ] deal."

As Judge Oberdorfer wrote with measured understatement, "[a]ny argument that the 20,000 figure is unreasonable or arbitrary is weakened by GW's acquiescence to an identical cap set by the campus plan in effect from 1985–2000, and its earlier representations to the Board that the cap should be continued." *GWU II*, Pet. App. C at 31. The United States Court of Appeals did not address Condition 8.

██ "Courts do not look with favor on abrupt reversals of direction by litigants as they proceed from one court [or other forum] to the next. In general, parties may not assert one theory at trial and another on appeal." *District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 182 (D.C.1993) (citations and internal quotation marks omitted). Moreover, "[i]n the absence of exceptional circumstances, this court will not entertain contentions not raised before the [BZA]." *Glenbrook Rd. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 605 A.2d 22, 33 (D.C. 1992). The University cites nothing in the record to suggest that its proposed population caps were conditional and that it so advised the Board, or that the University

was withdrawing its representation that the cap under the previous campus plan should be continued. "[P]oints not asserted with sufficient precision [below] ... will normally be spurned on appeal." *Miller v. Avirom,* 127 U.S.App. D.C. 367, 370, 384 F.2d 319, 322 (1967). Accordingly, because the University failed to preserve the issue, we reject its challenge to Condition 8. *But cf.* note 31, *infra.*[14]

#### (6) *Condition 10.*

Condition 10 requires the University to house all of its freshmen and sophomores on campus. Because the issues relating to Condition 10 are closely related to those involving Revised Condition 9(a), and because timing is critical to the resolution of the dispute over Condition 10, we defer our substantive discussion of this condition to Part IV of this opinion, in which we address Phase I of the campus plan.

### C. *The Human Rights Act.*

#### (1) *Synopsis.*

▬▬▬▬ The University contends that the conditions imposed by the BZA, both in Phase I of its order and in Phase II, are contrary to the DCHRA, which prohibits, *inter alia,* discrimination in housing on account of, *inter alia,* "matriculation." *See* D.C.Code §§ 2–1401.01 *et seq.* (2001). The Act defines "matriculation," in pertinent part, as "the condition of being enrolled in a college, or university," D.C.Code § 2–1401.02(18) (2001), and students are therefore a protected class. The District responds, in substance, that the Human Rights Act does not apply to zoning or to the activities of the BZA, and that even if it does, the conditions imposed by the Board on the University's Campus Plan do not discriminate against students.

Although we reject the District's arguments regarding coverage and its claim that the Board's actions were not aimed at students *qua* students, we cannot agree with the University's contention that the conditions imposed by the Board contravene the interdictions of the Act. Rather, we conclude that the Human Rights Act must be considered in conjunction with the District's Comprehensive Plan, 10 DCMR § 1327.1(b), 11 DCMR § 210.7 (1999), and with the applicable Zoning Regulations, 11 DCMR § 210.2. The DCHRA, if read as a whole and together with these land use measures, cannot reasonably be construed as prohibiting consideration by the BZA, in evaluating the University's Campus Plan, of the "number of students" who

---

**14.** The University also challenges Revised Condition 9(d) and Condition 15(e). Revised Condition 9(d) requires the University to file semiannual reports with the Zoning Commission detailing, *inter alia,* the number of full-time undergraduates, the number of available beds, and the location of those beds (*i.e.,* within or outside the boundaries of FBWE). The University's sole argument against Revised Condition 9(d) is that because, in its view, Condition 8 is improper, the imposition of this related reporting requirement is likewise arbitrary and capricious. But in light of our rejection of the University's challenge to Condition 8, see text, *supra,* its claim that Revised Condition 9(d) is invalid likewise fails. Moreover, in our view, this reporting requirement is a reasonable method by which

the Board can monitor the University's compliance with the substantive provisions of the Board's order.

Condition 15(e) requires the University to collect information regarding the registration of its students' motor vehicles and to "consult" with the Department of Motor Vehicles (DMV) with respect thereto. In its brief, the District effectively acknowledges that the consultation requirement serves no valid purpose because the DMV advised the Zoning Commission, by letter dated April 7, 2003, that it would not find a list of student-owned vehicles to be useful. We therefore recognize that the consultation provision of Condition 15(e) is no longer in dispute. We conclude that the information collection provision of that condition is not arbitrary or capricious.

would reside in off-campus University housing and of the effect of that student presence on residential neighborhoods adjoining the campus.

### (2) Coverage.

We deal first with the District's contentions regarding the Act's coverage. According to the District, the DCHRA does not explicitly refer to zoning and therefore does not apply at all to the decisions of the BZA. Thus, says the District, even if the BZA's conditions discriminate on account of matriculation—a proposition which the District vigorously contests—they nevertheless do not run afoul of the Act. In other words, it is argued, the BZA is allowed under the Act to engage in anti-student discrimination (and, presumably, to appease or accommodate anti-student sentiment in residential communities). If we were to accept the District's argument and carry it to its logical conclusion, then the DCHRA, notwithstanding its prohibition against discrimination on account of matriculation, would countenance the complete exclusion of students from an entire neighborhood. We are of the opinion that such a position, which would surely give the DCHRA an extraordinarily narrow reach, cannot be sustained.

We are satisfied that the Human Rights Act proscribes discrimination against students by the BZA in the exercise of the Board's authority to enforce the zoning regulations. It was the explicit intent of the Council, in enacting the DCHRA, "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including ... matriculation." D.C.Code § 2–1401.01 (2001). The elimination of discrimination on prohibited grounds is a policy to which "both this nation and its capital city have accorded the 'highest priority.'" *Harris v. District of Columbia*

*Comm'n on Human Rights,* 562 A.2d 625, 626 (D.C.1989) (quoting *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 211, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972)). The Human Rights Act is a broad remedial statute, and it is to be generously construed. *Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 889 (D.C. 1998); *Simpson v. District of Columbia Office of Human Rights,* 597 A.2d 392, 398 (D.C.1991). We have described the DCHRA as a "powerful, flexible and far-reaching prohibition against discrimination of many kinds." *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.,* 749 A.2d 724, 732 (D.C.2000) (citation and internal quotation marks omitted); *see generally Lively v. Flexible Packaging Ass'n,* 830 A.2d 874, 887 (D.C.2003) (en banc); *Carter–Obayuwana v. Howard Univ.,* 764 A.2d 779, 787–88 (D.C.2001).

There is no question that the DCHRA prohibits invidious discrimination in housing. *See* D.C.Code § 2–1402.21(a)(1). It would surely be incongruous to suggest that a "highest priority" remedial statute such as the DCHRA proscribes individual refusals to rent to students by private landlords, but that it has no application to allegations that a District agency has effectively excluded numerous students from a neighborhood in one fell swoop, by limiting the availability in that neighborhood of housing designed for occupancy by students.

Analogous federal precedents are instructive. As the court stated in a case in which a municipal zoning ordinance prohibiting the construction of additional apartments was shown to have the effect of perpetuating racial segregation in housing, "[t]o hold that local government is immune from the proscriptions of [the federal Fair Housing Act] 'turns the old "state action" controversy on its head.'"

*United States v. City of Black Jack,* 508 F.2d 1179, 1183 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975) (quoting *Mayers v. Ridley,* 151 U.S.App. D.C. 45, 50, 465 F.2d 630, 635 (1972) (en banc) (Wright, J., concurring)). "[T]he comprehensive purpose of the [Fair Housing] Act would be diluted if it were held to apply only to the actions of private individuals and entities." *United States v. City of Parma,* 661 F.2d 562, 572 (6th Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982). Like the Fifteenth Amendment, *see Lane v. Wilson,* 307 U.S. 268, 275, 59 S.Ct. 872, 83 L.Ed. 1281 (1939), and the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.,* and *see Black Jack,* 508 F.2d at 1184, the Human Rights Act bars "all forms of discrimination, sophisticated as well as simple-minded." *Id.* (quoting *Williams v. The Matthews Co.,* 499 F.2d 819, 826 (8th Cir. 1974)).

The federal fair housing statute, enacted in 1968 to prohibit racial and other invidious discrimination in housing, has consistently been construed as prohibiting the exclusion, through a municipality's exercise of its zoning authority, of housing designed, in whole or in part, for members of protected groups. *See Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,* 558 F.2d 1283, 1288–90 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) (discriminatory refusal to rezone violates Fair Housing Act); *Southend Neighborhood Improvement Ass'n v. County of St. Clair,* 743 F.2d 1207, 1209 (7th Cir.1984) (Fair Housing Act proscribes, *inter alia,* "exclusionary zoning decisions, and other actions by individuals or governmental units which directly affect the availability of housing to minorities"); *Bryant Woods Inn, Inc. v. Howard County,* 911 F.Supp. 918, 946 (D.Md.1996) (Fair Housing Act "prohibits local governments from applying land use regulations in a manner that will ... give disabled people less opportunity to live in certain neighborhoods than people without disabilities"). As the court explained in *Black Jack,* 508 F.2d at 1186, zoning measures with racially exclusionary consequences make dwellings unavailable on account of race, and this proposition holds true, as in *Black Jack,* even in the absence of an identifiable individual victim of a racially discriminatory rental or sale transaction. Discrimination in zoning amounts to discrimination in housing on a far larger scale, and it would be incongruous to suggest that the first is countenanced by the Human Rights Act while the second is unlawful.

■ We are confident that the Council did not intend the DCHRA to have a narrower reach and to be less effective than its federal fair housing counterpart with respect to coverage of discriminatory application of the zoning laws by municipal governments and their instrumentalities. *See, e.g., Lively,* at 887 (discussing applicability to DCHRA of decisions construing federal civil rights statutes). Here, according to the University, the BZA issued a decision designed to "limit" the "encroachment" by students into FBWE. *GWU III,* 355 U.S.App. D.C. at 14, 318 F.3d at 205. The Board thereby assertedly restricted the number of rental agreements into which students could enter in the neighborhood, and thus made it more difficult for students, because they are students, to live in FBWE. *Cf. Bryant Woods Inn,* 911 F.Supp. at 946. Such actions, if proved, are not beyond the scope of the DCHRA. We conclude that the BZA is subject to the interdictions of the Human Rights Act, and that the Act may be invoked against any application of the zoning regulations which discriminates, in purpose

or effect,[15] on grounds prohibited by the Act. Parties may disagree as to whether a particular action or decision by the BZA, or by another District agency, is or is not discriminatory, but while that issue may determine the final result of the case, it does not affect coverage.[16]

(3) *Discrimination on account of student status.*

The District asserts that even if, as we have held in Part III B (2) of this opinion, the DCHRA applies to the decisions of the BZA, there has been no violation of the Act. According to the District, Revised Condition 9 simply directs that more housing shall be made available on campus. This measure, the District contends, does not prohibit undergraduates from living in FBWE; indeed, the argument goes, they can live wherever they choose. Accordingly, says the District, Revised Condition 9 has no discriminatory purpose or effect. To the extent that this contention is meant to suggest that Revised Condition 9 was not designed to "protect" FBWE from "too many" students, and from the perceived undesirable traits and behavior of some undergraduates, it cannot be reconciled with the record.

In *GWU III*, the United States Court of Appeals sustained the District's position with respect to the constitutional contentions raised by the University, but it nevertheless provided a realistic and "earthy" assessment of the nature of the conditions imposed by the Board. These conditions, the court observed, were "*aimed at limiting, and even rolling back, encroachment into [FBWE] by the university—or, more precisely, its students.*" *GWU III*, 355 U.S.App. D.C. at 14, 318 F.3d at 205 (emphasis added). "[I]t seems inescapable," the court continued, "that the District is drawing a distinction based on student status." 355 U.S.App.D.C. at 18, 318 F.3d at 209. Moreover, in the court's view, "the implicit basis for the Board's distinction of students from others" was that "on average [students] pose a risk of behavior different from that generally preferred by non-student residents . . . ." *Id.*

We find ourselves in agreement with these conclusions. That the principal purpose of the BZA's actions was the "protection" of FBWE from the perceived bane of too many students is apparent from Revised Condition 9(a) in Phase I. In that condition, the Board insisted that, by Au-

---

**15.** "Any practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." D.C.Code § 2–1402.68 (2001).

**16.** A newly-enacted provision of the DCHRA states, with exceptions we do not deem applicable, that

> it shall be an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program or benefit to any individual on the basis of an individual's actual or perceived . . . matriculation.

D.C.Code § 2–1402.73 (Supp.2003) (effective October 1, 2002). Although this provision did not become law until several months after the BZA issued its final decision, we are nevertheless required to obey its commands. *See*

*United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801) (Marshall, C.J.); *Speyer v. Barry*, 588 A.2d 1147, 1154 (D.C.1991). The University views § 2–1402.73 as applicable to the present case. The facts before us do not easily fit within the statutory language, which appears to be directed at the administration of District of Columbia government programs rather than at the adjudicative responsibilities of the District's agencies. It is difficult to believe, on the other hand, that the drafters of this provisions intended to countenance any governmental action which would prevent or impede residence in an area of members of a protected class. We need not decide this issue, however, for we conclude, for the reasons stated in the text, that the BZA's application of the zoning regulations is covered by the DCHRA.

gust 31, 2002, 5600 beds for undergraduates must be provided on campus, or, if not on campus, then in other neighborhoods, *but not in FBWE.* In other words, 70% of the University's undergraduates would be permitted to live on campus, or in Georgetown, (or, for that matter, in Hobart, Tasmania), as long as they did not live in FBWE—the neighborhood which the BZA's order was designed to protect from further "encroachment." By the same token, non-students, including individuals who might have been expelled by the University, were unaffected by the Board's directive. We are satisfied, as were our federal appellate colleagues, that Revised Condition 9 was based on consciously different treatment of students because of their status as students, *i.e.,* on account of matriculation.[17]

### (4) *The Comprehensive Plan and the Zoning Regulations.*

The DCHRA is not the only legislative enactment germane to the issue at hand. For the past eighty-three years, beginning in 1920, the District's zoning regulations have required educational institutions to demonstrate that they are "not likely to become objectionable in a residential district because of noise, traffic, and *number of students.*" Zoning Regulations, § II, ¶ 8 (*d*) (1930) (emphasis added). The modern regulations, as we have seen, permit the BZA to grant a special exception for the development of a university campus located in a residential district if the Board is satisfied that development "is not likely to become objectionable to neighboring property because of noise, traffic, *number of students*, or other objectionable conditions." 11 DCMR §§ 210.2, 200.3

(emphasis added). The regulations are thus designed to ensure that a "reasonable accommodation has been made between the University and the neighbors which does not interfere with the legitimate interests of the latter." *Glenbrook Rd.,* 605 A.2d at 32.

The BZA is also required to "consider, to the extent they are relevant, the policies of the District Elements of the Comprehensive Plan." 11 DCMR § 210.7. It must guard against "unreasonable campus expansion into improved low-density districts." 11 DCMR 210.3; *see Levy v. District of Columbia Bd. of Zoning Adjustment,* 570 A.2d 739, 742 (D.C.1990) (campus development cannot "unreasonably expand the campus"); *George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment,* 429 A.2d 1342, 1349 (D.C.1981) (purpose of campus plan regulations is to "keep universities from expanding into residential neighborhoods without control").

The current Comprehensive Plan to which the zoning regulations refer was enacted in 1984 by the Council of the District of Columbia. D.C.Code § 1–301.62. It directs the BZA and other agencies to consider the Comprehensive Plan's objectives and policies in their "campus plan . . . and other decisions." 10 DCMR § 112.6(b). A major theme of the Comprehensive Plan is to stabilize and improve the District's neighborhoods. 10 DCMR § 101.1(a).

The Comprehensive Plan includes detailed provisions for each of the District's wards. In the portion of the Plan that relates to Ward 2, the Council addressed

---

**17.** Contrary to the District's position, Revised Condition 9(a), which provides that 70% of the University's undergraduates must reside on campus or, if off-campus, then outside FBWE, has the potential effect of "steering,"

*i.e.,* directing students to different areas because they are students. *Cf. Gladstone Realtors v. Vill. of Bellwood,* 441 U.S. 91, 94, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); D.C.Code § 2–1402.22 (2001).

the University's history of expansion, as well as the perceived lack of sufficient on-campus housing for GWU's undergraduates. According to the Comprehensive Plan, "George Washington University continues to expand its operations in the Foggy Bottom area.... The campus plan should include sufficient dormitory space for the student body *on campus* to alleviate some of the pressure on housing by students." 10 DCMR § 1327.1(b) (emphasis added). The Comprehensive Plan goes on to state:

> The expansion of the University has resulted in the diminishment of housing and the construction of buildings for university purposes. This and other commercial usage is of grave concern to the Foggy Bottom residential community. Intense student pressure on Foggy Bottom's housing stock outside the campus, combined with the impact of university generated traffic has had a negative effect on residential Foggy Bottom. The University *must continue to construct student dormitories* to alleviate pressure on the housing stock outside of the boundaries of the campus plan. The University must be sensitive to the surrounding residential neighborhood.

10 DCMR § 1358.1 (emphasis added).

The DCHRA was enacted in 1977. Both before and since its enactment, the "number of students" has been a factor which the BZA has been required to consider in determining whether a campus plan is fair to neighboring residents. In adopting the most recent Comprehensive Plan, the Council has effectively reiterated this criterion, and has directed that further dormitories are to be constructed on GWU's campus in order to "alleviate pressure" on the adjoining residential neighborhood, *i.e.*, FBWE. At the same time, the Comprehensive Plan expressly states that the District is committed to fair housing under the DCHRA, and that the elimination of discriminatory barriers to the availability of housing is a major goal of the Plan. Thus, the very measure that commits the District to fair housing and equal opportunity reiterates the "number of students" criterion. The only reasonable inference from the foregoing is that the Council, committed as it has been to fair housing since the enactment of the DCHRA, does not view the long-standing practice of considering the "number of students" in the BZA's assessment of campus plans as constituting forbidden discrimination on account of matriculation. To conclude otherwise would be to posit a glaring inconsistency between different provisions of the same Comprehensive Plan.

 Where two statutes conflict, our "task is to reconcile them if possible." *See, e.g., In re Estate of Green,* 816 A.2d 14, 18 (D.C.2003) (quoting *District of Columbia v. Brown,* 739 A.2d 832, 840 (D.C. 1999)). If the conflict is irreconcilable, the more specific statute governs the more general one, and the later supersedes the earlier. *Speyer,* 588 A.2d at 1163.[18] In this instance, the DCHRA addresses the issue before us in a rather general and perhaps oblique way; "matriculation" is the twelfth of sixteen grounds on which discrimination is proscribed, and although the statutory language is broad—discrimination because of matriculation is prohibited, period—we know of nothing to suggest

---

18. [T]his court has often recognized the well-settled rule of statutory construction that a special statute covering a particular subject matter is controlling over a general statutory provision covering the same and other subjects in general terms. This is particularly true where, as here, the more specific statute was enacted after the general one.

*Onabiyi v. District of Columbia Taxicab Comm'n,* 557 A.2d 1317, 1319 (D.C.1989) (citations and internal quotation marks omitted).

that, in enacting the DCHRA, the Council was taking aim at the long-standing balancing approach between students and neighboring residents. The zoning regulations, on the other hand, have specified for more than eighty years that the "number of students" is a legitimate consideration, and the most recent Comprehensive Plan—adopted long after the enactment of the DCHRA—deals, specifically and in detail with what is expected of GWU in Ward 2 in relation to that very issue. Reiterating that the Council which adopted the Comprehensive Plan could not have believed that the "number of students" criterion violates the DCHRA, we conclude that Revised Condition 9 does not contravene that statute.[19]

Our conclusion in this regard is bolstered by an additional consideration. Universities and other educational institutions are subject to the prohibitions of the DCHRA, but with one notable exception, namely, that they are not prohibited from discrimination on the basis of matriculation or non-matriculation. *See* D.C.Code § 2–1402.41(1)-(2) (2001) (omitting "matriculation" as a prohibited factor). Thus, if the DCHRA were construed as foreclosing consideration by the BZA of the "number of students," and if that proposition were carried to its logical conclusion, then it would be permissible for the University to acquire *all* of the housing in a residential area and exclude non-students from it. That, surely, is not a result that the DCHRA was enacted to accomplish.[20]

**19.** But see the discussion of Condition 9(f) and note 13, *supra*.

**20.** We also entertain some doubt as to whether (1) the University has standing under the DCHRA to assert the rights of unidentified students for whom the Board has allegedly made it more difficult to reside in FBWE; *cf. Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Speyer,* 588

## IV.

## PHASE I

### A. *Introduction.*

■ In its decision of January 23, 2002, the Board ordered the University, in Revised Conditions 9(a) and 9(b), to provide beds for at least 5600 undergraduates, either on campus or outside FBWE, no later than August 31, 2002. On April 12, 2002, however, in *GWU II*, the United States District Court declared the relevant provisions of the Board's order to be unconstitutional. On February 4, 2003, in *GWU III*, the United States Court of Appeals reversed the decision of the District Court, thus reinstating the campus plan as approved by the Board in its final order. The appellate court's mandate, however, was not issued until May 5, 2003. This court heard argument on June 19, 2003, to consider the University's challenge under District of Columbia law to the conditions imposed by the Board. Two weeks later, on July 3, 2003, we stayed the relevant portions of the Board's order until further order of this court. Revised Condition 9 and Condition 10 have thus been enforceable against the University for only a small fraction of the period since the Board imposed them.

■ Although the District has argued to the contrary, we are satisfied that the University was entitled to treat Judge Oberdorfer's decision in *GWU II* as controlling until it was set aside by the United

A.2d at 1159–63; and (2) the University's claim under the DCHRA was presented to the Board with sufficient clarity and precision for the issue to be preserved. The District has not, however, challenged either the University's standing under the Act or the proposition that the discrimination claim is properly before this court. Accordingly, we do not reach these issues.

States Court of Appeals and until the mandate in *GWU III* was issued. "[I]t is clear that the decision of [the trial] court remains binding and enforceable until the issuance of the [appellate court's] mandate. Any action [contrary to the trial court's ruling] ... prior to the issuance of the mandate directly flouts the authority of [the trial] court...." *Heartland By–Products v. United States,* 223 F.Supp.2d 1317, 1333 (Ct. of Int'l Trade 2002).[21] In other words, the University was not obliged to comply with conditions imposed by the Board when the United States District Court—the only court which, at that time, had passed on their validity—had held them to be unconstitutional. This is not a case of delaying tactics by the University. GWU raised legitimate constitutional questions, and secured a largely favorable ruling from an experienced federal district judge, even though that judge's decision was ultimately reversed. The University cannot fairly be penalized for presenting non-frivolous federal constitutional claims to a federal forum.

 The precise issue as to Phase I— whether the University must provide at least 5600 undergraduate beds *no later than August 31, 2002*—could plausibly be viewed as moot, for the target date has long come and gone. Nevertheless, we believe that we must assess the validity *vel non* of Revised Condition 9(a). We so

conclude because, if that condition was invalid—and in our opinion it was—then, if we fail to decide the issue, the same error may well be repeated when the Board addresses what is to be done in future years. However, in fashioning appropriate relief, we must take into consideration the passage of time, as well as present realities.[22]

## B. *Revised Condition 9(a).*

 The principal issue in relation to Phase I concerns Revised Condition 9(a), described above. Because there were only 4108 on-campus beds available for undergraduates on campus at the time the order was issued, the University was required by this condition to obtain approximately 1500 beds—more if student enrollment expanded—in a relatively brief period of time. The University challenged Revised Condition 9(a) in the federal courts as one with which it was impossible to comply; as duplicative, prohibitively expensive, and therefore irrational, arbitrary, and capricious; and as beyond the authority of the BZA. The University reiterates these contentions here, pointing out (correctly) that its administrative law burden under District of Columbia law is less onerous than the substantive due process burden that it confronted in the federal courts. *See Pearson, supra* note 3, 961 F.2d at 1221.[23]

---

**21.** We deem altogether unacceptable under the rule of law the contention of the Office of Corporation Counsel, apparently made on behalf of the Zoning Commission, that Judge Oberdorfer's decision in *GWU II* holding certain Revised Conditions unconstitutional should have been disregarded by the University because it was declaratory only and because no injunctive relief had been issued.

**22.** For this reason, and in the interests of completeness, we have alluded in this opinion to undisputed evidence as to certain events that have occurred since the Board issued its

final orders. This evidence has come to our attention as a result of litigation over the University's motions for a stay of the Board's order. In any event, the post-order evidence has confirmed our view as to the proper disposition of the case.

**23.** This was not always the University's position. In oral argument before the United States Court of Appeals, counsel for the University told the court that her constitutional case was "even better" than her case under District of Columbia law.

When Revised Condition 9(a) was challenged on constitutional grounds, the District Court invalidated it, but the appellate court reinstated it. Judge Oberdorfer capsulized the problem before him as follows:

Revised Condition 9(a)-(c) of the Board's Final Order requires GW to provide housing for 5600 + students on-campus or outside of Foggy Bottom by August 2002. Currently, GW has 4120 beds on-campus for its full-time undergraduates, leaving it approximately 1500 beds short of the Board's mandate.... GW also has more than 1400 beds in buildings, located within Foggy Bottom/West End but outside the campus boundaries, that it currently uses by right as dormitories. There is no dispute that GW's use of these beds for student housing is permitted by the zoning regulations. *See* [BZA's] March 29, 2001 Order at 9 (student housing is a use "permitted by the Zoning Regulations."); *see also* 11 DCMR § 3104.4. Nonetheless, the Board refuses to credit these beds towards the University's 5600 + housing requirement.

If GW is not given credit for these existing off-campus facilities, it will need to fill the 1500 + gap by leasing or purchasing additional facilities off-campus and outside of Foggy Bottom, because the dormitories currently under construction on-campus will not be available as student residences until at least the 2004–2005 academic year. *See* [BZA's] January 23, 2002 Order at 6.

The Board disparages this obvious anomaly, claiming that acquisition of 1500 + beds on-campus or outside of Foggy Bottom/West End by August of this year is "not an onerous requirement," because the University was previously able to acquire 709 beds in less than a year by leasing City Hall and the Pennsylvania House. [BZA's] January 23, 2002 Order at 6, 18. However, simply because the University has in the past been able to scramble to find housing needed for additional students does not justify governmental action forcing the University to go to similar effort and expense to find twice as many beds that are unneeded.

*GWU II*, Pet.App. C at 16–17 (citations and footnotes omitted). The judge noted the explicit acknowledgment by some Board members that the Board's refusal to include "of right" beds in the off-campus dormitories in the required 5600 beds was "rather punitive" vis-a-vis the University, but the Board nevertheless decided to adhere to that course. *Id.* at pages 18–19.

The United States Court of Appeals viewed the issue quite differently:

The parties agree that this requirement will force the university to acquire temporary accommodations for about 1400 students in off-campus, non-Foggy Bottom locations—accommodations that might be not only expensive (though the university has offered no data on just how large an expense) but less desirable for students than the university housing already available to students off-campus in Foggy Bottom.

GW spins these conditions as generating a completely irrational expense. It says that they in effect render "duplicative" the university's current off-campus student housing in Foggy Bottom, which is (concededly) in full conformity to the residential zoning there. But in reality nothing in the transitional housing plan forces the university to give up its off-campus Foggy Bottom dorms or prevents it from continuing to house students there.... Of course, the university might choose instead to sell its off-campus Foggy Bottom properties or convert them to another use. But the fact that it might do so doesn't render

the District's regulation an improper encroachment on its by-right use of those properties.

*GWU III*, 355 U.S.App. D.C. at 19, 318 F.3d at 210.[24] The court went on to say that there was no irrationality in the plan because "it cannot be irrational to adopt rules likely to limit or reduce the number of students in the area." *Id.*

With due respect to our federal appellate colleagues, we do not apply their permissive constitutional analysis of this issue to the administrative law question presented to us. The requirement in Revised Condition 9(a) that the University acquire housing for approximately 1500 undergraduates outside Foggy Bottom in a period of a few months creates problems which the United States Court of Appeals did not address. First, there was no adequate record support for the BZA's finding that it would be possible for the University to accomplish what Revised Condition 9(a) requires. The Board noted that, in the summer of 2001, the University was able, on short notice, to lease two off-campus properties in FBWE that provided a total of 706 additional beds. Revised Condition 9(a), however, required the University to acquire more than twice as many beds in areas further from the campus. As Judge Oberdorfer pointed out in *GWU II*,

> [t]he Board's judgment, that GW can acquire housing for twice as many beds in half the time, is unsupported by the record and contradicted by the testimony of Charles Barber, the University's general counsel. In a series of hearing[s] conducted by the Board, Barber repeatedly and consistently represented that the University's ability to meet an obligation to provide housing for 70% of

its undergraduates in the short-term, and certainly by August 2002, was premised on inclusion of existing off-campus dormitories in Foggy Bottom.

Pet.App. C at 17–18. We are aware of no contrary evidence.

Second, any properties in other areas of the District (or, in Northern Virginia) would necessarily have to be acquired on a short-term basis; by the fall of 2006, pursuant to Revised Condition 9(c), all 5600 beds must be provided on campus. We agree with Judge Oberdorfer that it would be anomalous to require the University to take these steps when, for the interim period, beds in FBWE, all in dormitories which are permitted by the zoning regulations, are available to house the undergraduates in more convenient locations far nearer to the campus. Moreover, there were and are at least plausible legal objections to the requirements of Revised Condition 9(a), and the University, which surely had the right to seek judicial redress, has exercised that right. Thus, in conformity with the requirements of Revised Condition 9(a), the University might well acquire properties far from campus in conformity with the Board's order and then succeed in having Revised Condition 9(a) struck down. This would leave the University with a mortgage or a lease or a contract for which it would have no practical use.

Third, the consideration of the "number of students," which has evidently guided and even dominated the Board's disposition of the issue before us, is not the only criterion set forth in the zoning regulations. In considering the university presence in a residential neighborhood, the BZA must assure that it is "not likely to

---

**24.** The court noted that at Harvard and Columbia Universities, most students (97% at Harvard, 90% at Columbia) live in university-provided housing. *Id.* at 210 n. 2. The sources cited by the court did not indicate, however, that all of this housing is on campus.

become objectionable to neighboring property because of noise, *traffic*, number of students, or other objectionable conditions." 11 DCMR §§ 210.2, 507.7, 507.8 (emphasis added); *see GWU III*, 355 U.S.App. D.C. at 14–15, 318 F.3d at 205–06. Unlike its original order issued in 2001 and preliminarily enjoined in *GWU I*, the Board's order on remand—the order now before us—contains no discussion of the additional traffic and parking problems which would be generated by 1400 or more student commuters who would be coming in and out of the FBWE neighborhood on every school day from 2002 to 2006. The zoning regulations authorize off-cam pus "interim use [by the University] of land or improved property ... *within a reasonable distance of the college or university campus*." 11 DCMR § 210.5.[25] Revised Condition 9(a), if enforced, has the perverse effect of moving undergraduates significantly further from the campus than they were before. To quote Judge Oberdorfer, "in addition to the unreasonable burden it places on GW, [Revised Condition 9(a)] is also contrary to legitimate zoning objectives, including the preservation of other residential neighborhoods outside [FBWE] and alleviation of traffic and parking congestion." *GWU II*, Pet. App. C at 18.

Finally, we are of the opinion that by imposing Revised Condition 9(a), the BZA encroached, albeit indirectly, on powers reserved to the Zoning Commission. In *Watergate West*, 815 A.2d at 766–67, the court recognized—consistently with the BZA's own position—that the BZA may not prevent a university from using housing in a residentially zoned area as a dormitory when such use is permitted by 11 DCMR § 210.1. That regulation, promulgated by the Zoning Commission, provides that such by-right use is not subject to the special exception process required for on-campus development. *Id.* at 766–67. In this case, the BZA did not attempt, in its order, *directly* to prohibit the University from utilizing its FBWE properties as dormitories. Indeed, the Board recognized that it had no authority to issue such a prohibition. In our view, however, the requirement that the University secure approximately 1500 beds outside FBWE during Phase I is the equivalent of a direct ban, for it puts the University to the following unpalatable choices: either create irresistible incentives for undergraduates housed in FBWE dormitories to move into the newly-acquired units outside that neighborhood, or allow the newly-acquired beds to lie largely vacant—a choice that would be very difficult, if not impossible, for the University to make. The FBWE dormitories vacated as a result of these incentives or measures would presumably then revert to non-dormitory use.

In fact, it appears that such a return to past uses was what the Board had in mind

---

25. We agree with the following observation by Judge Oberdorfer:

> The Board turns this regulation on its head, seeking to prevent the University from using existing facilities within walking distance of campus to count towards its housing requirement, and instead forcing GW to provide additional residential facilities in more distant parts of the city. The Board, which has a responsibility to the city as a whole, acknowledges that its orders "should not be instruments for exporting University housing into other neighborhoods in order to protect Foggy Bottom/West End," January 23, 2002 Order at 9, but implements an order that does precisely that for its first, four-year phase, even though already existing on-campus and off-campus dormitories, together with the University's commitment for additional on-campus housing ... make such exportation unnecessary.

*GWU II*, Pet.App. C at 18. The United States Court of Appeals did not address this point in *GWU III*.

when it required the University to acquire beds outside FBWE. In rejecting the University's objections to Revised Condition 9(a), the District stated:

> [T]he Board's Order does not prevent the University from continuing to use the Foggy Bottom acquisitions for dormitories. It only prevents such acquisitions from counting toward the undergraduate housing goal. *If the University finds it infeasible to continue their current use [i.e., as dormitories], nothing in the record suggests an impediment to their return to preexisting uses or to long-term residential use.*

(Emphasis added.)

■ Realistically appraised for what it does, Revised Condition 9(a) amounts to the exercise by the Board of authority which the law entrusts to the Zoning Commission and not to the BZA, namely, the authority to rezone. *See Watergate West*, 815 A.2d at 768.[26] That the Board has done so indirectly rather than directly does not save Revised Condition 9(a). *Cf., e.g., AFL–CIO v. Bingham*, 187 U.S.App. D.C. 56, 69 n. 3, 570 F.2d 965,

978 n. 3 (1977) (Fahy, J., concurring in part and dissenting in part) (an agency may not "accomplish, either inadvertently or intentionally, that which it could not do directly ..."); *see also T.I.M.E., Inc. v. United States*, 359 U.S. 464, 475, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959).[27]

For the foregoing reasons, we conclude that Revised Condition 9(a) is arbitrary and capricious and constitutes an impermissible exercise of the Board's authority.

### C. Condition 10.

■ The University has also asked us to vacate, as arbitrary and capricious, Condition 10, which reads in pertinent part as follows:

> Commencing in the Fall 2001[28] semester, the University shall require all full-time freshmen and sophomore students to reside in University housing located within the campus boundary established by the Board, to the extent that such housing is available. The University may exempt students who commute, are married or have children, or have dis-

**26.** We cannot agree with the BZA's assertion in its Final Order that, rather than seeking to regulate the University's land use elsewhere than on campus, the Board was exercising only its "power to regulate the use of *campus* property." *See also Watergate West*, 815 A.2d at 767 n. 8 (distinguishing prior decisions on this ground). A condition ordering GWU to acquire 1500 new beds off-campus cannot meaningfully be said to regulate campus use, even if the *sanction* for non-compliance is a restriction on the University's right to pursue nonresidential development on campus. Moreover, Revised Condition 9(a) distinguishes between different off-campus areas-*i.e.*, between FBWE and any other off-campus neighborhood—and not between on-campus and off-campus uses. Indeed, this condition regulates what may be done off-campus in one single neighborhood, namely FBWE.

**27.** Lest we be misunderstood, we do *not* believe that Phase II of the order in general or

Revised Condition 9(c) in particular constituted *de facto* or "stealth" rezoning. The requirement in Revised Condition 9(c) that at least 70% of all undergraduates reside on campus is consistent with the District's Comprehensive Plan and with the University's own announced intentions. Unlike Revised Condition 9(a), Revised Condition 9(c) is not aimed at FBWE, but at the development of the campus, and it does not require the University to acquire numerous beds far from campus so that the student residents of the FBWE dormitories are likely to be removed from the neighborhood.

**28.** This Condition was a part of the Board's original 2001 order. Obviously, by the time its final order was entered in 2002, compliance could not be secured by September 2001.

abilities or religious beliefs inconsistent with residence hall life.

The University claims that there is no evidence that freshmen and sophomores are more objectionable than upperclassmen, and that therefore "Condition 10 represents the paradigm of a conclusion that is legally insufficient and that does not flow rationally from its findings."

The United States District Court agreed with this contention even under the highly deferential constitutional standard of review. The court noted that the University had no objection to placing all freshmen and sophomores in *"university-controlled dormitories,"* and had indeed suggested this condition. The judge further observed, however, that HOVA had been "configured so that it is suitable only for freshm[a]n housing." *GWU II,* Pet.App. C at 32. Because HOVA is located in FBWE but off-campus, however, it could not be counted, under the BZA's stern regime, towards the 5600–bed target. Judge Oberdorfer concluded that

> any condition that prohibits the University from using an existing, by-right dormitory to house freshmen or sophomores and forces the University to find substitute housing for these students in a distant location, at least until the University has had a reasonable period of time to complete its on-campus dormitory construction, would be an impermissible infringement on substantive due process rights .... [Citation omitted.] The minimal objectionable impact, if any at all, of allowing freshmen to remain in the Hall on Virginia Avenue until suitable housing has been constructed within the campus boundaries does not provide a reasonable basis for [the] Board to exclude beds in that dormitory from

being credited towards the University's housing obligation.

*Id.*

The United States Court of Appeals disagreed, in part because it read the record differently:

> The district court also found a constitutional flaw in Condition 10, which requires freshmen and sophomores to live *on campus* "to the extent such housing is available." But as the District notes, it was the university that originally proposed this measure as an element of its campus plan. Normally, a party cannot attack its own proposed agency action, [citations omitted] .... And, even apart from the university's self-contradiction, the condition seems readily to meet the latitudinarian standards of substantive due process. A city might reasonably consider the youngest college students to be the ones most likely to disturb residents in the surrounding communities, as well as the most likely to need whatever shreds of parietal rules [that] may subsist on campus.

*GWU III,* 355 U.S.App. D.C. at 20, 318 F.3d at 211 (emphasis added).

A careful reading of these two passages reveals that the two courts disagreed as to precisely what it was that the University had proposed to the Board. According to the District Court, the University's proposal was that freshmen and sophomores live in "university-controlled" dormitories, which could be on-campus or (like HOVA) off-campus. The Court of Appeals, on the other hand, assumed that, under the University's plan, freshmen and sophomores were to "live *on campus* " to the extent housing there was available. Unfortunately, the record is as confusing on the point as is the difference in the reactions of the two courts. Most of the references in the record, as well as common sense,[29] support

29. Having spent a substantial amount of mon-

ey on acquiring a freshman dormitory

Judge Oberdorfer's assumption that the University meant to place underclassmen in university-controlled housing, not necessarily in on-campus housing.

Nevertheless, it appears that the representatives of the University were sometimes, at best, alarmingly incautious with their language. As the District wrote in its opposition to the University's motion for a stay,

> it is true that the university wavered throughout, often saying that it proposed to compel freshmen and sophomores to reside in university-controlled housing, [but] it was also more explicit on occasion. On September 13, 2000, the university filed an exhibit titled "Major Changes to the Plan since the April Hearing" in which it responded to "community issues." One such issue concerned "Inadequate Dormitory Space within the Campus Plan Boundaries." R. 1872. The university wrote (*id.;* emphasis in original):
>
> > Response:
> >
> > \* \* \* \* \* \*
> >
> > *Freshmen and sophomores* (except for students who are commuters, are married, or have children) *will be required to live on campus* beginning in Fall 2001 for freshmen and Fall 2002 for freshmen and sophomores.

On November 14, 2000, the university's counsel submitted proposed findings and conclusions to the Board. R. 2929. Counsel wrote (2933–2934; italics added):

> 1. Key components of the Plan are the following:
>
> \* \* \* \* \* \*
>
> University agreement to house freshmen and sophomores *on campus.*

(HOVA) *off-campus,* the University would have been foolish to propose, intentionally,

The document goes on to say (R. 2952; italics added):

> The proposed [increase in] beds combined with GW's commitment to house all freshmen and sophomores *on campus* \* \* \* demonstrates the University's willingness to respond to community concerns \* \* \*.

On the other hand, a representative of the District acknowledged in May 2003, at a hearing on the motion for a stay, that the University's proposal was more limited. When the Board's Chairman stated his belief that Condition 10 had been proposed by the University, counsel for the District corrected him:

> ASSISTANT CORPORATION COUNSEL: Mr. Chair, if I could just make one slight correction. It's true that the University offered a condition like [C]ondition 10, but they did *not* indicate that the housing of freshmen and sophomore[s] would be on campus. They indicated that they would implement a policy to house freshmen and sophomores in their dorms. But they did *not* indicate that the [dorms] would be located on campus, *which was something the Board added to [C]ondition 10.*
>
> CHAIRPERSON GRIFFITHS: Right. Okay. Indeed. And I appreciate that correction.

(Emphasis added.)

The Board nevertheless made the following Finding of Fact (No. 10):

> The Applicant testified that the university will require all freshmen and sophomore students to live in *on-campus housing* by 2002, except for those who are commuters, are married, have children, or have disabilities or religious beliefs inconsistent with residence hall life.

that all freshmen and sophomores live *on campus.*

(Emphasis added.) Even though, in May 2003, the Board's Chair apparently credited Corporation Counsel's statement that it was *the Board* which added the "on campus" requirement, and not the University that proposed it—almost a judicial admission on behalf of a party to the controversy—we cannot say, in light of the record as a whole, that the foregoing finding lacks substantial evidence to support it. Accordingly, we are compelled to sustain Condition 10.[30]

This result is troubling, for the University's infelicitous phrasing may cost the University millions of dollars and prevent it from putting HOVA to the use for which it was designed. If Condition 10 imposes serious hardship on the University, the University is, of course, free to request the BZA, following this remand, to amend its order. Indeed, in light of the commendable candor of counsel for the District at the hearing before the Board on the University's motion for a stay, and given the evident fact that the Board's finding was based at least in part on the University's imprecise articulation of its position, a negotiated resolution of the issue may be possible and would undoubtedly be in the interests of justice.[31]

In any event, Condition 10 is closely related to Revised Condition 9(a), which we have held in this opinion to be invalid. Condition 10 is also one of the conditions

stayed by our order of July 3, 2003. Because we must remand the case to the Board in any event in light of our disposition of Revised Conditions 9(a) and 9(f), we think it best to maintain in force the stay of Condition 10 pending action by the Board on remand. We also maintain in force the stay as to Revised Condition 9(b) insofar as it applies to Phase I of the campus plan. The stay is moot as to disapproved Revised Conditions 9(a) and 9(f).

## V.

## CONCLUSION

For the foregoing reasons, the order of the Board of Zoning Adjustment is affirmed in part and vacated in part. The case is remanded to the Board for further proceedings consistent with this opinion.

*So ordered.*[32]

---

**30.** The District argues that even if Condition 10 was not proposed by the University, there was evidentiary support from the University's witnesses that freshmen and sophomores cause more trouble than upperclassmen, that freshmen accounted for 56% of the cases before the student judiciary, and that younger students' "youth and relative immaturity render them most in need of guidance." This evidence may justify placing freshmen and sophomores in university-controlled housing, but not necessarily in on-campus housing.

**31.** Although the University did not preserve its objection to Condition 8, the parties and

the Board may also wish to consider whether the faculty cap on that Condition reasonably serves the land use purposes of the Board's order.

**32.** The Zoning Commission promulgated a rule, effective December 8, 2000, that transferred the authority to review campus plans from the BZA to the Zoning Commission. *See* Z.C. Order No. 932, 47 D.C.Reg. 9725 (2000). That rule does not apply, however, to cases, including this one, that were initiated before the rule went into effect. Accordingly, we remand the case to the BZA rather than to the Zoning Commission.