**KALORAMA CITIZENS ASSOCIATION,**
Petitioner,

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT,**
Respondent,

**Advisory Neighborhood Commission 1C and Montrose LLC, Intervenors.**

No. 06–AA–486.

District of Columbia Court of Appeals.

Argued May 2, 2007.

Decided Oct. 25, 2007.

John Lawrence Hargrove, for petitioner.

Alan J. Roth, for intervenor Advisory Neighborhood Commission 1C.

Eric M. Rome, Washington, DC, for intervenor Montrose LLC.

Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Edward E. Schwab, Deputy Solicitor General, filed a statement in lieu of brief for respondent.

Before KRAMER, FISHER, and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

In this case we are called upon to review a decision of the District of Columbia Board of Zoning Adjustment (the "BZA" or the "Board") that upheld building permits issued with respect to a building located at 1819 Belmont Road, N.W. ("the subject building" or the "subject property").[1] The permits allowed the property owner, intervenor Montrose LLC ("Montrose"), to demolish an existing row house and construct a new, five-unit apartment building from the ground up, adding two more levels than the previous structure had, as well as new roof structures. The result, depicted in several photographs contained in the record, is that the subject building now towers over neighboring buildings.

After petitioner Kalorama Citizens Association ("KCA")[2] and intervenor Advisory Neighborhood Commission 1C ("the ANC")[3] challenged the permits, the BZA held a public hearing that concluded on

---

1. The permits in dispute are Permit Nos. B455571 and B455876, issued by the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA").

2. According to the petition that KCA filed with the BZA on November 10, 2003, KCA is a citizens' organization whose members include individuals who live and own residences within 200 feet of the subject property. KCA is "interested in protection of the architectural integrity and aesthetic values of the neighborhood in which this property is located" and in "faithful adherence to the

District's laws and regulations governing construction, including those relating to permissible height and density."

3. D.C.Code § 1–207.38(a) provides for division of the District of Columbia into "neighborhood commission areas" and for the establishment of an elected ANC for each such area. Each elected ANC may "advise the District government on matters of public policy regarding planning" and other matters in its neighborhood commission area. *Id.*, § 1–207.38(c)(1).

April 20, 2004, after five days of testimony. KCA and the ANC (hereafter sometimes referred to as "the challengers") participated in the public hearing and made numerous written submissions to the BZA, contending *inter alia* that the permits were unlawfully issued because they allow the subject building to have a gross floor area, and the subject property to have a floor area ratio ("FAR"), that exceed the maximums permitted under District of Columbia zoning regulations.[4] The BZA deliberated during a public hearing held on June 22, 2004, and announced its rulings at the close of that hearing. On November 8, 2005, the BZA issued written findings of fact and conclusions of law, concluding that "the Zoning Administrator properly determined that the building's floor area ratio was within the matter of right limit."[5]

In the instant petition for review, the challengers contend that the BZA ruling must be reversed because it upheld action by the Zoning Administrator that contravened the District's zoning regulations.[6] Specifically, KCA and the ANC contend that the method that the Zoning Administrator used to calculate the floor area of the lower level of the subject building understates that level's contribution to "gross floor area," and that the Zoning Administrator improperly excluded from the gross floor area calculation a sixth-level space that the challengers assert does not meet the definition of "attic" incorporated in the zoning regulations. Additionally, both challengers assert that the BZA failed to address several of the issues they raised, an omission that, the ANC contends, was a breach of the BZA's statutory obligation to give "great weight" to the ANC's recommendations.[7]

■ Applying the requisite deferential standard of review,[8] we are not persuaded

4. The zoning regulations define "gross floor area" as "the sum of the gross horizontal areas of the several floors of all buildings on the lot, measured from the exterior faces of exterior walls and from the center line of walls separating two (2) buildings." 11 DCMR § 199.1. " 'Floor area ratio' is a density restriction defined in the Zoning Regulations as 'a figure that expresses the total gross floor area as a multiple of the lot. This figure is determined by dividing the gross floor area of all buildings on a lot by the area of that lot.' " *Cathedral Park Condo. Comm. v. District of Columbia Zoning Comm'n*, 743 A.2d 1231, 1236 n. 2 (D.C.2000) (citing 11 DCMR § 199.1 (1995)).

5. The Zoning Administrator is an officer of DCRA, *see* 11 DCMR § 199.1, who reviews zoning issues presented by building permit applications. *See Bannum, Inc. v. District of Columbia Bd. of Zoning Adjustment*, 894 A.2d 423, 427, 427 n. 3 (D.C.2006).

The BZA agreed with KCA that a new roof deck on the subject building caused the building to exceed applicable building-height limitations, but rejected KCA's contention that the building's new penthouse structure was not set back the required distance from two side walls. Those aspects of the BZA's decision are not in dispute in the instant petition for review.

6. In its petition to this court, KCA sought review of not only the BZA's June 22, 2004 and November 8, 2005 rulings, but also the BZA's April 4, 2006 order denying KCA's motion for partial reconsideration and rehearing. However, KCA's brief does not address the claims raised in that motion, and we therefore deem the claims to be abandoned. *See Deramus v. Donovan, Leisure, Newton & Irvine*, 905 A.2d 164, 176, 176 n. 22 (D.C.2006) (the result of an appellant's failure to urge a point in its appeal brief is that we deem the point abandoned).

7. *See* D.C.Code § 1–309.10(d)(3); *see also* 11 DCMR § 3115.2.

8. "Generally, 'our review of the [BZA's] factual determinations is deferential.' " *Lovendusky v. District of Columbia Bd. of Zoning Adjustment*, 852 A.2d 927, 932 (D.C.2004) (quoting *George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment*, 831 A.2d 921, 931 (D.C.2003)).

on this record that the BZA's decision upholding the building permits conflicts with the zoning regulations. And, while we concur with KCA and the ANC that, in some aspects, the BZA's written decision is less detailed and more opaque than perhaps is desirable, we are satisfied that the BZA's written decision and the written record of the BZA's deliberations sufficiently reveal the BZA's reasoning as to all but one issue. Regarding that one issue—the issue of whether the sixth level of the subject building qualifies as an "attic"—we agree that the BZA did not analyze the issue by reference to the applicable regulatory definition, and thus did not adequately address the concerns of KCA and the ANC. For that reason, the BZA also did not fully satisfy its obligation to give great weight to the concerns expressed by the ANC. Accordingly, a remand is in order.

## Background

The subject building is located in a residential area zoned as R–5–D. Improvements on lots located in R–5–D districts may have an overall maximum FAR of 3.5. *See* 11 DCMR § 402.4. As explained in footnote 4, *supra*, FAR is determined by dividing the gross floor area of all buildings on a lot by the area of the lot. *See* 11 DCMR § 199.1. Thus, the "gross floor area" of the subject building is a major determinant of whether the subject property's 3.5 FAR limit is exceeded.

As defined in the zoning regulations, the term "gross floor area" includes the following floor space:

> *basements*, elevator shafts, and stairwells at each story; floor space used for mechanical equipment (with structural headroom of six feet, six inches (6 ft., 6 in.), or more); penthouses; *attic space (whether or not a floor has actually been laid, providing structural headroom of six feet, six inches (6 ft., 6 in.), or more);* interior balconies; and mezzanines.

*Id.* (italics added). Accordingly, the "gross floor area" of the subject building includes the building's basement and also includes any space that is an attic space with "structural headroom" of at least six feet, six inches. The zoning regulations define a "basement" as "that portion of a story partly below grade [*i.e.*, ground level], the ceiling of which is four feet (4 ft.) or more above the adjacent finished grade."[9] 11 DCMR § 199.1. The zoning regulations do not contain a definition of "attic," but they provide more generally that "[w]ords not defined in this section shall have the meanings given in Webster's Unabridged Dictionary." 11 DCMR § 199.2(g).

The subject building is sandwiched between two other row houses on its east and west sides; thus, no "adjacent finished grade" can be seen at the sides of the building. At the front of the building (the building's southern face), the ceiling of the lower level is more than four feet above the adjacent grade; at the rear of the building, the lower level is completely below grade.[10] As explained to the BZA by project architect Norman Smith, "the lower level has exposure only on the south side. It is bunkered on all remaining sides...." In terms of the zoning regulations, this situation—a partially bunkered lower level—raises the issue of whether the lower level is part basement and part

---

9. By contrast, the regulations define a "cellar" as "that portion of a story, the ceiling of which is less than four feet (4 ft.) above the adjacent finished grade." *Id.* The litigants agree that cellar space is not included in gross floor area.

10. The lower level does not extend as far northward as the upper levels of the building; in the terminology used by Montrose, the lower level "does not extend through the whole footprint of the building."

cellar, as Montrose contends (meaning that a substantial portion of the lower-level floor area need not be included in "gross floor area"), or instead is fully a basement, as the challengers contend (meaning that the entire lower level must be included in "gross floor area" for purposes of the FAR calculation). Hereafter, we refer to this issue as the "basement issue."

As indicated *supra*, this case also involves an "attic issue," which relates to the sixth level of the subject building. Architectural drawings in the record show that the sixth level, which does not extend all the way to the front of the building, is covered by a sloping roof. Positioned below the roof rafters are a series of "collar ties."[11] According to Montrose's architect, the collar ties are structural elements, "act[ing] in tension with, essentially as compression braces for, the [roof] rafters." The undersides of the collar ties also form a portion of the ceiling of the sixth-level. From the floor of the sixth level to its ceiling at the level of the collar ties, the height is six feet five and a quarter inches, *i.e.*, less than six feet six inches. (By contrast, as shown on the architectural drawings, on levels one through five of the building, the floor-to-ceiling height exceeds ten feet.) Montrose refers to the sixth level as "attic" space with "structural headroom" of less than six feet six inches, which need not be included in "gross floor area" for purposes of the FAR calculation.

KCA and the ANC contend that the sixth level simply is not an attic, regardless of the height of any structural headroom it may have, and therefore that the sixth-level floor space cannot properly be excluded from "gross floor area" for FAR purposes.

While the parties and intervenors disagree about whether the subject building's lower level is fully a basement and whether the sixth-level space is an attic, they do agree on one important point: that if either the entire lower-level space or the sixth-level space is counted in gross floor area, the FAR of the subject property would exceed the regulatory limit.

### The BZA's Ruling

At the outset of the BZA's oral deliberations, the BZA Chairman acknowledged that the subject building "is clearly out of context with the rest of the block [*i.e.*, the 1800 block of Belmont Street, N.W.] and the adjacent structure." Nevertheless, the BZA upheld the building permits, agreeing with the Zoning Administrator that the building does not exceed the FAR limit.

Regarding the basement issue, the BZA noted that the zoning regulations "provide no guidance on how to calculate the FAR of partial basements and partial cellars," but that the Zoning Administrator's Office "has employed at least two methods for calculating lower-level FAR: the grade-plane method[12] and the perimeter wall

---

11. KCA's expert, architect Donald Hawkins, explained at the BZA hearing that "[i]t's easier to imagine, to picture how a collar tie works if you'll imagine an equilateral triangle, the bottom being the collar ties and the top two [sides] being the roof rafters."

12. In a sworn statement submitted to the BZA, former Zoning Administrator Jim Fahey, who, the record indicates, served as the District's Zoning Administrator from 1970 to 1986, stated that his predecessor Zoning Administrator devised and began using the

"grade plane method" in 1958, for the purpose of distinguishing between a basement and a cellar "in the case of a row house or other building where the grade on either side could not be observed because the building was directly abutted by other buildings on either side." Mr. Fahey explained that the grade plane method involves drawing on the building plans a line, *i.e.*, "a grade plane line[,] from the grade at the front of the building to the grade at the rear of the building." Any portions of the lower level where the ceiling is "four or more feet above the

method." [13] The BZA explained that:

> Under the "perimeter wall" method, the FAR is determined by establishing a ratio between the linear footage of the portion [of the] perimeter wall with more than four feet out of grade and the total square footage of the lower level. Under the "grade plane" method, a plane is established between the grade at the front of the building and the grade at the rear of the building. The point at which this plane intersects at a four foot level, any portion that exceeds that plane counts toward FAR and any portion that does not is considered a cellar.

November 8, 2005 Order at 14.

The BZA noted that:

> [t]he difficulty arises when the lower level is partially above and partially below that four-foot plane [*i.e.*, the plane at the level that is four feet above grade], and when the adjacent grade cannot be determined. Such is the case here

where the Project is bounded on either side by row dwellings and the finished grade is not apparent.

*Id.* Although acknowledging KCA's position that "the basement floor area was incorrectly calculated using the 'perimeter wall method' instead of the 'grade plane method,'" the BZA concluded that "[b]oth methods appear reasonable[,] and the choice of which is most appropriate is within the Zoning Administrator's discretion." November 8, 2005 Order at 14. Accordingly, the BZA concluded, "the floor space in the basement was correctly calculated [by the Zoning Administrator] using the perimeter wall method in the plans submitted by Montrose." *Id.* at 15. The BZA found that "[a]t most, only 147.3 square feet of space on the lower level [about one-fifth of the lower-level space] is a basement, which counts toward FAR," enabling the project to "compl[y] with the density limitation of 3.5 FAR for the R–5–D District." [14] *Id.* at 15.

---

average grade plane" line would be treated as basement space and included in gross floor area.

**13.** The "perimeter wall method" is described in greater detail in a September 11, 1990 memorandum written by former Zoning Administrator Fahey, introduced as an exhibit before the BZA. (At the time he prepared the September 11, 1990 memorandum, Mr. Fahey was working as a consultant to a law firm.) The memorandum explains that:

> In the case of a building that has a difference in grade, resulting in floors that are by definition part basement and cellar; you use the following method for obtaining the floor area charged to gross floor area:
> 1. First, measure the total perimeter of the floor in question.
> 2. Then, measure that portion of the perimeter of the floor, the ceiling of which is four feet or more above the adjacent finished grade, and what percentage this is of the total perimeter of the floor in question.

> 3. The answer to the above will be the percentage of the floor area chargeable to gross floor area.

**14.** According to one of the exhibits in the record, the lower level of the subject building has a perimeter of 131.4 linear feet. The front wall, the only side where the ceiling can be seen to be at least four feet above grade, measures 27 linear feet. The floor area of the lower level is 736.6 square feet. Applying the "perimeter wall method" as we understand it, one would take the ratio of the front wall length to the entire perimeter (*i.e.*, 27/131.4), multiply that by the floor area of the lower level (736.6 square feet), and obtain the result of 151.35 square feet, which is the square footage of lower-level space that the perimeter wall method dictates must be included in gross floor area as basement space. On some of the exhibits in the record, this amount was calculated to be 147.3 square feet (the figure to which the BZA referred in its written findings). On a different exhibit that utilizes a slightly different entire-perimeter measurement, the amount of lower-level space includable in gross floor area is recorded as 161.6

Regarding the "attic" issue, the BZA acknowledged KCA's assertion that "the area counted as attic space should have been included in the gross floor of the project." *Id.* at 13. The BZA then went on to state:

> [KCA] contended that the plans showed that the attic's ceiling was not "structural" and therefore should not have been used to limit the height of the attic space. If the ceiling is not counted as "structural headroom" then the height would exceed six feet six inches and the space would be included in the Gross Floor Area, and the building would exceed 3.5 FAR.
>
> The term "structural" is not defined in the Zoning regulations, accordingly the definition for zoning purposes is provided by Webster's Unabridged Dictionary pursuant to 11 DCMR 199. The dictionary defines "structural" as "of or relating to the load bearing members or scheme of a building, as opposed to the screening or ornamental elements."
>
> The Board credits the testimony of the architect of record for the Project that because the building is framed from front to back, rather than relying on the adjacent walls of the abutting townhouses for support, the collar ties forming the attic ceiling were not ornamental, but served as structural members necessary to help brace the building against racking in a north-south direction. The Board therefore concludes that the collar ties created structural headroom of less than six feet, six inches, and thus the space was properly excluded from FAR calculations.

*Id.* at 14.

Finally, the BZA acknowledged that it was required under D.C.Code § 1–

309.10(d) to give "'great weight' to the issues and concerns raised in the affected ANC's written recommendation." *Id.* at 15. The BZA stated that "[i]n this case, the ANC joined with KCA in the ... arguments that the Board has fully considered and addressed...." *Id.*

## Standard of Review

 Our review of BZA factual determinations is deferential. *See George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment*, 831 A.2d 921, 931 (D.C.2003). We will uphold the BZA's findings "if they are based on substantial evidence in the record as a whole." *Id.*, quoting D.C.Code § 2–510(a) (2001). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Giles v. District of Columbia Dep't of Employment Servs.*, 758 A.2d 522, 524 (D.C.2000). We must determine "(1) whether the [BZA] made a finding of fact on each material contested issue of fact; (2) whether substantial evidence in the record supports each finding; and (3) whether the [BZA's] conclusions of law follow rationally from the findings." *George Washington Univ.*, 831 A.2d at 931. We "will defer to the Board's findings and will not second-guess the Board's decision unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Citizens Ass'n of Georgetown v. District of Columbia Bd. of Zoning Adjustment*, 925 A.2d 585, 589 (D.C.2007). "We defer to the BZA's interpretation of the zoning regulations unless its interpretation is plainly wrong or inconsistent with the governing statute." *Kuri Bros. v. District of Columbia Bd. of Zoning Adjustment*, 891 A.2d 241, 244 (D.C.2006); *see also Downtown*

---

square feet. Our understanding is that, whichever of these figures is the correct result of applying the perimeter wall method, use of

the method does not cause the subject property to exceed the FAR limit.

*Cluster of Congregations v. District of Columbia Bd. of Zoning Adjustment,* 675 A.2d 484, 491 (D.C.1996) (the BZA's interpretation of the zoning regulations is controlling "unless plainly erroneous or inconsistent with the regulation").

■ Our function "in reviewing administrative action is to assure that the agency has given full and reasoned consideration to all material facts and issues," a function we can perform only "when the agency discloses the basis of its order by an articulation with reasonable clarity of its reasons for the decision." *Felicity's, Inc. v. District of Columbia Bd. of Appeals & Review,* 851 A.2d 497, 502 (D.C.2004) (quoting *Dietrich v. District of Columbia Bd. of Zoning Adjustment,* 293 A.2d 470, 473 (D.C.1972)).

## Discussion

### A. The Basement Issue

#### 1. The Specifics of KCA's and the ANC's Challenge

The regulatory definition of "basement" is at the center of KCA's and the ANC's challenge to the BZA's ruling on the basement issue. As already noted, a "basement"—the area of which must be included in "gross floor area"—is "that portion of a story partly below grade, the ceiling of which is four feet (4 ft.) or more above the adjacent finished grade." 11 DCMR § 199.1. The gist of the challengers' argument is that, to implement the foregoing regulatory definition as part of determining a building's gross floor area, "in all ... cases it is necessary ... to measure how much, if any, of the floor area on the ground floor has ceiling more than four feet above the adjacent grade, and to include that amount in 'gross floor area' and thus FAR"; and that if the adjacent grade and the ceiling height above it are impossible to observe and measure, there must be

another way of arriving at the required measurements.

KCA and the ANC accept that the "perimeter wall method" can be used to apportion lower-level space between "basement" and "cellar" for a freestanding building, because the grade adjacent to all of the building's perimeter walls can be observed. They contend, however, that the perimeter wall method cannot be used in cases such as this, where the grade adjacent to the subject building's side walls cannot be observed, because it is impossible to complete the method's step that entails measuring "that portion of the perimeter ..., the ceiling of which is four feet or more above the adjacent finished grade." *See* note 17, *supra.* Because the Zoning Administrator did not and could not make that measurement, KCA and the ANC argue that the method that he used to calculate the square footage of lower-level space includable in the subject building's gross floor area was not actually the "perimeter wall method," but instead was an unprecedented and unauthorized "front-wall-only" method. The "front-wall-only" method, they argue, not only fails to take into account the adjacent grade at the building's other walls (as they assert the regulatory definition of "basement" requires), but also contravenes what they assert is the "intent of the zoning regulations." That intent, they say, is to "make the amount of a ground floor area that a builder must count against density limits dependent on two variables: the amount of floor area and grade of the lot—the steeper the grade, the greater the proportion of 'cellar' space is likely to be; and the greater the total floor area of the ground floor, the more floor area will be apportioned to each type."

KCA and the ANC contend that the BZA should have required the Zoning Administrator to use the grade-plane method,

which entails estimating the level of the grade adjacent to the subject building's side walls. As KCA asserts, "the whole point of the grade plane method ... is ... to approximate what the grade would look like if you were able to see the grade because you had no obstructing buildings on either side," enabling the Zoning Administrator to arrive at "a reasonable approximation of the actual grade of the ground on which the building sits." Under the grade plane method as the challengers apply it, the entire lower level of the subject building must be treated as a basement and thus must be included in gross floor area.

### 2. Analysis

In essence, KCA and the ANC urge us to read the regulatory definition of "basement" to require the Zoning Administrator, for FAR-calculation purposes, to estimate the level of the (presumed) grade adjacent a building's lower level if no grade can be observed. The BZA, however, read the regulation as affording the Zoning Administrator discretion as to how to apply the definition of "basement" in cases where the grade adjacent to a building's lower level cannot be observed. *See*

BZA Order at 14 (addressing the issue of how to resolve "the difficulty [that] arises" in applying the regulatory definition of basement when a building "is bounded on either side by row dwellings and the finished grade is not apparent"). The BZA reasoned that in such cases, it is reasonable to calculate the lower level's contribution to gross floor area either by using the "perimeter wall method" (and, as the Zoning Administrator did, taking into account only the portion of the lower-level perimeter wall where, visibly, the ceiling is four or more feet above the adjacent grade); [15] or by using the "grade-plane method," which entails estimating the level of the presumed adjacent grade.

■ We will not disturb the BZA's interpretation that the regulatory definition afforded the Zoning Administrator discretion to use the apportionment method that he used. That is because, as we go on to explain, we conclude that the interpretation is neither "clearly erroneous [n]or inconsistent with the zoning regulations as a whole." *Wallick v. District of Columbia Bd. of Zoning Adjustment*, 486 A.2d 1183, 1184 (D.C.1985).

---

**15.** As our statement suggests, we do not agree with KCA and the ANC that the Zoning Administrator deviated from the "perimeter wall method." We think that the step in that method that calls for measuring "that portion of the perimeter of the floor, the ceiling of which is four feet or more above the adjacent finished grade" is reasonably read—as apparently the Zoning Administrator reads it-to mean "that portion of the perimeter of the floor, the ceiling of which *can be observed or measured to be* four feet or more above the adjacent finished grade." So read, the "perimeter wall method" requires what the record shows the Zoning Administrator did: he included only the length of the subject building's (27–foot) front wall in the numerator of the fraction used to apportion the lower-level floor space, since the front wall is the only area where the adjacent grade (and the extent

to which the wall at ceiling level is out-of-grade) can be observed and measured.

Acting Zoning Administrator Denzil Noble represented, in a statement submitted to the BZA on May 11, 2004, that the "perimeter calculation methodology that was utilized in this project ... has been the practice of [the Office of Zoning Administrator] as far back as I can remember, during my twenty (20) years in the Building and Land Regulation Administration." Because we conclude that the Zoning Administrator adhered to the "perimeter wall method" in this case, we also conclude that this is not a case where the agency has "depart[ed] from its own established policy without providing a reasoned explanation for doing so." *Office of People's Counsel v. Public Service Comm'n*, 610 A.2d 240, 247 (D.C. 1992).

The challengers argue that the BZA's ruling that the Zoning Administrator had discretion to use the "perimeter wall method" is clearly erroneous because using the method required an assumption that "at the precise point where the ... [subject building's] front wall intersects with the ... side walls, the adjacent grade rose suddenly ... so as to place *literally* every inch of ... [the lower] level to the rear of that point less than four feet above grade." We do not agree that the BZA's ruling entailed such an assumption. Rather, the BZA's ruling is supported by the evidence, presented at the public hearing, that the rear wall of the subject building's lower level is entirely below grade and that *there is no adjacent grade* at the building's side walls. In their testimony before the BZA, both Montrose's expert witness (project architect Smith) and KCA's expert (architect Hawkins) characterized the adjacent grade as *nonexistent*. Mr. Smith testified that "along the east, west and north lines, [the subject building] is fully and completely below grade ... on the two sides, it's bunkered by adjoining buildings, so *there is no adjacent grade to speak of*" (emphasis added). Mr. Hawkins referred to *the subject building as presenting a* situation where there "[i]sn't an actual grade adjacent to the building," requiring him to "establish ... a fictional grade, the grade that probably was there before." And, in his statement submitted to the BZA, Acting Zoning Administrator Noble cautioned against "speculat[ing about] what the natural grade may be." In light of this testimony, we cannot find "clearly erroneous" the BZA's reading of the zoning regulations to permit the Zoning Administrator to use a method for determining "basement" space that relies on only the visible grade at the front of the subject building, and not on a fictional grade adjacent to the other perimeter walls.

■ Nor can we discern any way in which the approach that the BZA approved—identifying the amount of "basement" floor space by relying on the adjacent grade only to the extent that "grade" is visible—is inconsistent with the zoning regulations as a whole. We note that in a different section of the definitional regulation under discussion here (11 DCMR § 199.1), the zoning regulations define "natural grade" as "the undisturbed level formed without human intervention *or, where the undisturbed ground level cannot be determined because of an existing building or structure,* the undisturbed existing grade" (emphasis added). Thus, in the definition of "natural grade," the zoning regulations permit use of an alternative, measurable benchmark, rather than speculation, when the ground level referenced in the regulation cannot be observed. Here, the Zoning Administrator took an analogous alternative approach when presented with plans for a building's lower level whose "adjacent finished grade" (and the ceiling height above it) could be observed on only one side: he relied on only that one side of the building—the front wall, where at all points the ceiling visibly is at least four feet above grade—to determine the ratio used in the "perimeter wall method" and thus the apportionment of lower-level space between "basement" and "cellar."

KCA argues that the method that the BZA approved is arbitrary and capricious because it "bears no rational relation to the actual length and resulting floor area of the ground floor, increasing only modestly if the ground floor's length and thus floor space are greatly increased"; "do[es] not vary at all with variations in steepness of the grade"; and "for this reason alone must be found inconsistent with the zoning regulations." However, we discern from the zoning regulations neither an intent to vary the amount of floor space that must

be included in FAR in lockstep with any increases in the square footage of a building's bunkered lower-level space,[16] nor an intent to vary the amount of floor space includable in FAR on the basis of (what might have been) the steepness of the grade that at some previous time was adjacent to the building site.[17]

KCA emphasizes that the "grade plane method" is an available alternative method for ascertaining the amount of "basement" space and is a method which the BZA agreed was "a rational method for making . . . apportionment between 'basement' and 'cellar' in the case of . . . attached buildings." That is not a sufficient reason to disturb the BZA's order upholding the Zoning Administrator's use of the perimeter method. *Cf. Dupont Circle Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 749 A.2d 1258, 1262 n. 11 (D.C.2000) (the possibility of an alternative reading of the zoning regulations does not render the interpretation adopted by the

BZA an unreasonable one); *see also Bender v. District of Columbia*, 804 A.2d 267, 269 (D.C.2002) (a taxpayer challenging a real property tax assessment bears the burden of proving that the assessment is incorrect or illegal or that the assessment approach was irrational or unfounded, not merely that alternative methods give a different result or that another method is the best method) (citations omitted). Finally, the fact that use of the "grade plane method" would have resulted in inclusion of a greater portion of the subject building's lower-level space in gross floor area does not render use of the "perimeter wall method" unreasonable or otherwise unlawful. The zoning regulations neither prescribe a methodology for calculating the floor area of partial basements, nor require the Zoning Administrator to use the calculation methodology that results in including as large an area as possible in gross floor area.

**16.** Seemingly to the contrary, "[t]he FAR regulations do not restrict the amount of . . . space that may be added to a building below grade . . .; a builder may add as much space below grade as he or she chooses." *Brown v. District of Columbia Bd. of Zoning Adjustment*, 486 A.2d 37, 57 (D.C.1984); *cf. Raritan Dev. Corp. v. Silva*, 91 N.Y.2d 98, 105–06, 667 N.Y.S.2d 327, 689 N.E.2d 1373 (1997) ("[i]t seems clear that [the] zoning restrictions were never designed to combat the erection of primarily underground housing levels which do not contribute to bulky, high-rise development. It is eminently logical that cellars, housing levels that are more than halfway below the ground, would be excluded from FAR calculations notwithstanding the actual or intended use of the space").

**17.** In a related argument, KCA asserts that what it calls "the front-wall-only method" is demonstrably unreasonable because, under it, "two buildings, identical in all respects except that one is attached on both sides and the other is freestanding, will be awarded grossly different density allowances." We do not find this argument persuasive. Assuming that use

of the "perimeter wall method" could yield the result that KCA decries, we think there could be sound reasons for permitting the attached building to have a larger amount of lower-level floor space than the freestanding building is allowed to have. For example, permitting the attached building to have a greater amount of floor space on its (bunkered) lower level might be justified on the ground that uses of the bunkered space would have a minimal adverse impact on the neighborhood in terms of objectionable sound or lighting. *Cf. Glenbrook Rd. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 605 A.2d 22, 35 (D.C.1992) (noting the BZA's finding that "the substantial use of below-grade space [for a law school building] allowed for reduced light and sound," thus helping to "prevent objectionable impacts" on the community). It is not for us to say whether there actually may be a good policy reason for allowing the disparate result that KCA describes. Our point is simply that this possible result of using the "perimeter wall method" to determine the amount of basement space in an attached building does not render the method manifestly unreasonable.

For the foregoing reasons, we sustain the BZA's ruling with respect to use of the "perimeter wall method" to determine the square footage of "basement" space in the subject building.

## B. The Attic Issue

### 1. The Specifics of the KCA and ANC Challenge

We turn next to the attic issue. KCA argues that the BZA, concentrating on whether the sixth level of the subject building has "structural headroom," 11 DCMR § 199.1, failed to address in its written decision whether the sixth level actually is an "attic" within the meaning of the dictionary definition of "attic" that is incorporated into the zoning regulations pursuant to 11 DCMR § 199.2(g). Both KCA and the ANC contend that the BZA's decision upholding the Zoning Administrator's treatment of the sixth-floor space as an attic conflicts with that dictionary definition. The ANC also asserts that the BZA ignored the evidence that the sixth-floor space has amenities (eight windows, ten general purpose duplex convenience outlets, and three ceiling light fixtures) that show that it was intended to be habitable space. KCA agrees, arguing that the

sixth level is "an additional floor of usable space, labeled 'attic' and given a low ceiling for the evident purpose ... of circumventing the density restrictions of the Zoning Regulations...."

### 2. Analysis

■ The transcript of the BZA's June 24, 2004 deliberations makes clear that the BZA recognized that it was presented with the issue of whether the sixth level is an attic, not merely with the issue of whether the sixth level has structural headroom of at least six feet six inches.[18] The BZA Chairman stated at the outset of the BZA's deliberations, in his summary of the issues to be decided, that "what was brought up of issue is ... generally speaking, when is an attic an attic and how one decides that." The Chairman also acknowledged that the BZA is "bound, of course, to what the regulations tell us of what an attic is." However, the record shows unmistakably that the BZA's reasoning was that the sixth level would qualify as an "attic" if its headroom is "structural" (reasoning drawn at least in part, it seems, from some of the litigants' arguments).[19] During their deliberations, BZA members agreed that the sixth level is

---

**18.** We have considered the challengers' arguments in the context of the entire record of the BZA's proceedings, not just by looking at the BZA's November 8, 2005 written ruling. *Cf. Lovendusky*, 852 A.2d at 933–34 ("Our review of the BZA's extensive oral deliberations and its detailed written decision and order satisfies us that it explicitly addressed ... each of the issues and concerns the ANC 3D raised to the BZA's attention ...").

**19.** KCA argued to the BZA:

It is the collar ties ... that Montrose relies on in their effort to establish the structural character of the top floor head room.... We have placed testimony in the record that [these collar ties] are not merely redundant structural members but, in fact, they perform no significant structural function at all ... [because] they could be removed.

That being the case, the ceiling does not provide structural head room and the top floor must be included in FAR.

The BZA Chair thereafter summarized the issue as follows:

Of course, the appeal has given rise to the question of whether those structural members [the collar ties] could be removed ... *And [] once [those] are ... removed, it would not become an attic or that attic area*, or however you wanted to state it, would then go to the FAR calculations. [Emphasis added.]

The BZA went on to find that the building "plans depict an attic space less than 6 feet 6 inches in height from the floor level of the attic space to the underside of collar ties that form the ceiling of the attic."

attic space because "the structural portions of the building are there." The BZA made a similar statement in its November 8, 2005 written decision, concluding that "the collar ties forming the attic ceiling were not ornamental, but served as structural members necessary to help brace the building against racking in a north-south direction." This statement, it appears, was the BZA's resolution of the "whether the sixth level is an attic" issue. The flaw in the BZA's approach is that, under the dictionary definition of "attic" incorporated in the zoning regulations, the presence of structural headroom does not suffice to make a space an "attic." [20]

As we noted above, 11 DCMR § 199.2(g) provides that "[w]ords not defined in this section shall have the meanings given in Webster's Unabridged Dictionary." The unabridged, Webster's Third New International Dictionary sets out the following definitions of "attic":

1a: a low story or wall above the main order or orders of a facade in the classical styles

b: a room or rooms behind an attic

c: *the part of a building immediately below the roof and wholly or partly within the roof framing:* a garret or storage space under the roof

*Id.* (italics added).[21] The parties and intervenors focused the BZA's attention on the portion of definition 1c that we have italicized above; thus, the BZA was asked to consider whether the sixth level is "immediately below the roof and wholly or partly within the roof framing." [22] The record provides no explanation for why the other definitions would or would not apply—for example, why the sixth level of the subject building (which, with a height of six feet five and a quarter inches, is substantially lower in height than the building's other ten-foot-plus stories) would not qualify as "a room behind" a "low story ... above the main order or orders of [the] facade" of the building. In any event, the BZA did not explicitly consider or apply *any* of the unabridged Webster's dictionary definitions before concluding that the sixth level is an "attic." Because it failed to do so, and because we may not "supply a rationale [for the BZA's decision] by conjecture from what it did," [23] we agree with KCA and the ANC that a remand is required so that the BZA may consider the attic issue in light of the definitions incorporated by reference in the zoning regulations, and so that it can explain why it was or was not appropriate for the Zoning Administrator to treat the sixth level as an attic.

We will remand so that the BZA can make "a finding of fact on each material contested issue of fact." *George Washington Univ.,* 831 A.2d at 931. We reject,

---

20. We note that 11 DCMR § 199.1 includes within the definition of "gross floor area" not only attics with structural headroom of six feet six inches or more, but also "floor space used for mechanical equipment (with structural headroom of six feet, six inches (6 ft. 6 in.), or more)." If structural headroom were enough to render a space an attic, it appears that some mechanical equipment rooms, wherever located, would also be attics.

21. The definition of "garret" contained in the unabridged Webster's Third International Dictionary is, variously, "an unfinished part of a house immediately under or within the roof: loft" or "a room on the top floor of a house."

22. The litigants also referred the BZA to the definition of "attic" in the so-called BOCA ("Building Officials Code Administrators") Code, but we fail to see why that definition (which KCA asserts is "parallel in meaning and effect" to the dictionary definition, but appears to us to be substantively different from the Webster's dictionary definition) is pertinent here.

23. *Levy v. District of Columbia Bd. of Zoning Adjustment,* 570 A.2d 739, 753 (D.C.1990).

however, the challengers' argument that reversal, rather than remand, is warranted on the ground that the sixth level cannot qualify as an attic. In our view, the record does not make that a foregone conclusion. As noted, one of the applicable dictionary definitions refers to an attic as the part of a building located "wholly or partly within the roof framing." Conceivably, it appears to us, the collar ties that form the ceiling of the sixth level are part of the roof framing.[24] If that is so, then, it might be argued, the sixth level is to some extent "within" that framing. Also, as we have already conjectured, the sixth level conceivably qualifies as the "room or rooms behind" a "low story" that is the attic. These are questions that the BZA, not we, must resolve in the first instance (and we imply nothing about how they should be answered).[25]

During the BZA's deliberations, BZA members rejected the argument, urged primarily by the ANC, that the sixth level is not an attic because it has amenities that show that it is intended to be a habitable space rather than a storage space.[26] We will not disturb their reasoning on this point, because the Webster's dictionary definitions do not restrict "attic" status to non-habitable space.[27] We also agree with Montrose that the fact that attics are explicitly excluded from the definition of "habitable room" in 11 DCMR § 199.1 does not mean that a so-called "attic" that is habitable is not actually an attic with the meaning of the zoning regulations. As Montrose aptly explains, "Simply put, [the effect of this regulation is that] when the term 'habitable room' is used in the [zoning] regulations, those regulations do not apply to an attic, for whatever reason deemed appropriate."

## C. The "Great Weight" Issue

### 1. The ANC's Argument

Lastly, we turn to the ANC's procedural claims. The ANC contends that the BZA "failed to address KCA's argument, supported by ANC 1C in general terms in its December 23, 2003 vote and more specifi-

---

**24.** The unabridged Webster's Third New International Dictionary defines a "collar tie" as "a board used to prevent the roof framing from spreading or sagging."

**25.** KCA argues that the very narrow space between the roof rafters and the collar ties that form part of the ceiling of the sixth level is actually the attic of the subject building. We express no opinion on this either, leaving it to the BZA on remand to address, as necessary, questions (raised by the litigants' briefs) such as whether an attic must have some minimum size to satisfy the Webster's dictionary definition (*i.e.,* so that it can be a "room" or "storage space") and whether a building may have more than one attic.

**26.** BZA members reasoned that the relevant factor is the structure of the sixth level, not its intended use, saying:

One of the things that was implied during the testimony was that because of the certain number of outlets or the type of light-

ing fixtures ... perhaps the attic wasn't intended to be attic space, and that may or may not be true, but ... it doesn't change what the construction of the building is.

**27.** We note, moreover, the District of Columbia housing regulations contain general restrictions that require a habitable room to have a ceiling height greater than the ceiling six feet five and a quarter inch height of the sixth-level space in issue here. *See* 14 DCMR §§ 405.1 ("In any room that is otherwise a habitable room only that portion of the room area that has a clear ceiling height of not less than seven feet (7 ft.) shall be counted as habitable room") and 405.4 ("All habitable room area shall have a minimum clear head room of six feet eight inches (6 ft. 8 in.) under beams ..."). *See also* 11 DCMR § 101.4(d) (zoning regulation providing that the "provisions of any ... other municipal regulations shall govern whenever they ... (d) [i]mpose higher standards than are required by this title").

cally during the BZA hearing, that the actual method used by Montrose and the Zoning Administrator to calculate the basement FAR here was neither the grade plane method ... nor the perimeter wall method ..., but rather an unexplained mutation of the latter, which KCA has aptly labeled the front-wall-only method." The ANC also asserts that the BZA failed to address the ANC's explicit written objection in its December 22, 2003 report to Montrose's characterization of the upper story as an "attic" and failed to address the evidence adduced by ANC 1C regarding the amenities in the so-called "attic" (eight windows, convenience outlets, and ceiling light fixtures). Therefore, the ANC argues, the BZA failed to comply with the statutory requirement that it give "great weight" to the "issues and concerns raised in the recommendations of the [ANC]." D.C.Code § 1–309.10(d)(3)(A); see also 11 DCMR § 3115.2.

## 2. Analysis

▮ To comply with the requirement that it give "great weight" to the ANC's recommendations, the BZA was required to "acknowledg[e] ... the [ANC] as the source of the recommendations and [to make] explicit reference to each of the Commission's issues and concerns." D.C.Code § 1–309.10(d)(3)(A). Furthermore, the BZA was required to articulate its decision in writing, to "articulate with particularity and precision the reasons why the [ANC] does or does not offer persuasive advice under the circumstances," to "articulate specific findings and conclusions with respect to each issue and concern raised by the [ANC]," and to "support its position on the record." D.C.Code § 1–309.10(d)(3)(B).

The ANC recommendations that are entitled to "great weight" are the ANC's recommendations set out in a written re-

port submitted pursuant to D.C.Code § 1–309.10(d)(1) and 11 DCMR § 3115.1; see also Friendship Neighborhood Coalition v. District of Columbia Bd. of Zoning Adjustment, 403 A.2d 291, 295 (D.C.1979) ("the statute does not require the Board to give 'great weight' to [oral] testimony"). The ANC submitted its report to the BZA "[p]ursuant to 11 DCMR 3115" by letter dated December 22, 2003. In it, the ANC urged the BZA to sustain KCA's appeal "on all three grounds stated in Attachment 1 to the KCA's appeal filing." The ANC then set out comments regarding those three grounds: the building height and the roof structure set back issues that KCA had identified (issues not involved in the instant petition for review), and the issue that the ANC entitled "When is an 'Attic' Not an Attic? When It's a Ruse-to Evade Applicable FAR Limitations." In the portion of its report beneath that heading, the ANC asserted that the space that DCRA treated as an attic "is not an attic under the legally controlling [dictionary] definition of the term" and also is not an attic because "all signs seem to point toward a future resident's ability to use this space as a habitable room." The foregoing were the only issues that the ANC addressed in its December 22, 2003 report.

Thus, in the written report that the ANC submitted pursuant to 11 DCMR § 3115.1, the ANC did not address the basement issue. Accordingly, we can deal in short order with the ANC's contention that the BZA failed to give great weight to its position that the method that the Zoning Administrator used was not the perimeter wall method. Since the ANC did not express that issue or concern or offer a recommendation or advice about it or any other aspect of the basement issue in its December 22, 2003 written report, the BZA was not required to give great weight

to the ANC's views on the issue.[28]

Regarding the attic issue, for reasons already discussed, we agree with the ANC that the BZA's written decision did not "articulate with particularity and precision" why the BZA rejected the ANC's position, expressed in the ANC's December 22, 2003 written report, that the sixth level of the subject building is not an attic.[29] On remand, to comply with D.C.Code § 1309.10(d)(3), the BZA must articulate in writing specific findings and conclusions with respect to the ANC's concern that the sixth level does not fall within the Webster's dictionary definition of "attic" and, if the BZA disagrees with the ANC's position, must explain in writing why it does not find the ANC's position persuasive.[30]

## Conclusion

For the foregoing reasons, the case is remanded to the BZA on the issue of whether the sixth level of 1819 Belmont Road, N.W., falls within the dictionary definition of "attic" incorporated in 11 DCMR 199.1(g). As to the basement issue, the BZA's November 8, 2005 ruling is affirmed.

*So ordered.*

---

28. It appears, moreover, that during the hearing before the BZA and in post-hearing submissions, neither KCA nor the ANC argued that the method that the Zoning Administrator used was not the "perimeter wall method." To the contrary, in its "Appellant's Memorandum, on Additional Material Submitted by Montrose LLC Concerning Basement/Cellar FAR Calculation," KCA referred to the "perimeter method" "employed by Montrose and the Zoning Administrator."

29. Although perhaps not with sufficient particularity, the BZA's written decision did "come to grips with the ANC view," *Kopff v. District of Columbia Alcoholic Beverage Control Bd.*, 381 A.2d 1372, 1384 (D.C.1977), that the sixth-level ceiling configuration was a "ruse" to evade FAR limitations. The "ruse" theory, which was explained in more detail during the public hearings, was that Montrose's installation of collar ties (in lieu of mounting the ceiling on the roof rafters) was a structurally unnecessary step designed to bring the ceiling height below six feet six inches. The BZA concluded, however, that the collar ties were in fact necessary "structural members" (a finding that is not challenged here).

30. Nevertheless, we see no reason why the BZA, if it disagrees with the ANC's position after remand, would need to address with particularity the ANC's argument about the sixth level's habitability. As we have already observed, the unabridged Webster's dictionary definition of "attic" incorporated in the zoning regulations does not make habitability a relevant factor in determining whether the space is an attic. We have repeatedly held that if an ANC concern "is irrelevant under ... the zoning regulations[,] ... the [BZA]'s failure to consider and discuss this issue is not error." *Wheeler v. District of Columbia Bd. of Zoning Adjustment*, 395 A.2d 85, 91 (D.C.1978); *see also id.* at 91 n. 10 ("'[t]he Council did not intend to empower the Commissions to expand the factors that a board or agency may otherwise lawfully consider in reaching its decision. Thus, we interpret 'issues and concerns,' ... to encompass only legally relevant issues and concerns").